**In re the EXXON VALDEZ**

**This Order Relates to All Cases**

**No. A89–0095–CV (HRH).**

United States District Court,
D. Alaska.

Jan. 28, 2004.

*ORDER No. 364*

*Second Renewed Motion for Reduction
of Punitive Damages Award*

HOLLAND, District Judge.

*Preface*

On December 6, 2002, the court granted Exxon Mobil Corporation's (D–1) and Exxon Shipping Company's (D–2), hereinafter referred to as "Exxon", renewed motion

for reduction or remittitur and reduced a jury verdict awarding plaintiffs $5 billion in punitive damages to $4 billion.[1] The court concluded that application of the *BMW* guideposts supported the $5 billion award but, based on plaintiffs' alternative suggestion, reduced the award to $4 billion because the Ninth Circuit in earlier proceedings hereinafter described in detail had mandated that the award be reduced on remand. After final judgment was entered on the $4 billion award,[2] both Exxon and plaintiffs timely appealed.[3]

On April 7, 2003, before any briefing on the appeals in this case, the Supreme Court decided *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).[4] In *State Farm*, the United States Supreme Court revisited the due process issue as to punitive damages in the context of an insurance bad faith case. On August 18, 2003, the Ninth Circuit Court of Appeals vacated the $4 billion punitive damages judgment and remanded the case to this court to reconsider the punitive damages award in light of *State Farm*.[5] Upon remand, this court called for supplemental briefing from the parties to aid in its reconsideration.[6] Exxon submitted its supplemental briefing in the form of a second renewed motion for reduction or remittitur of punitive damages.[7] This motion is opposed by plaintiffs.[8] Oral argument on the second renewed motion for reduction or remittitur of punitive damages was heard on December 3, 2003.

1. Order No. 358, Clerk's Docket No. 7564. Order No. 358 was published as *In re Exxon Valdez*, 236 F.Supp.2d 1043 (D.Alaska 2002).

2. Order No. 359 (granting Motion for Rule 54(b) Determination) (Jan. 27, 2003), Clerk's Docket No. 7589; Judgment, Clerk's Docket No. 7566.

3. Clerk's Docket Nos. 7605 and 7609A.

4. *State Farm* will also be published as 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585.

5. *See* Order, Clerk's Docket No. 7737.

6. Order re Further Proceedings on Punitive Damages Award (Aug. 26, 2003), Clerk's Docket No. 7714.

7. Clerk's Docket No. 7753.

8. Clerk's Docket No. 7767.

■ After considering the parties' briefing and hearing oral argument, the court has determined it most practical, for purposes of reevaluating the punitive damages award, to vacate Order No. 358 in its entirety.[9] *State Farm* adds no new, free-standing factor to the constitutional analysis of punitive damages that the court might "tie onto" its previous order. It is the court's view that *State Farm*, while bringing the *BMW* guideposts into sharper focus, does not change the analysis.[10] In fact, there are aspects of the due process evaluation of punitive damages awards which have not changed at all as a result of *State Farm*. As a consequence, although the court is vacating Order No. 358, where the court perceives no need or necessity of further exposition of the facts or its view of the law, the court will simply replicate what it has previously said in Order No. 358.

*Facts*

Terrible things have happened in Alaska on Good Friday. On Good Friday, March 27, 1964, the strongest earthquake ever recorded in North America literally relocated the seabed of most of Prince William Sound and the Kenai Peninsula. On Good Friday, March 24, 1989, the oil tanker *Exxon Valdez* was run aground on Bligh Reef in Prince William Sound, Alaska.

On March 24, 1989, Exxon's co-defendant, Joseph Hazelwood, was in command of the *Exxon Valdez*. He was assisted by a third mate and a helmsman. Captain Hazelwood was a skilled mariner, but he was an alcoholic. Worse yet, he was a relapsed alcoholic; and, before departing Valdez, Alaska, on March 23, 1989, he had, more probably than not, consumed sufficient alcohol to incapacitate a non-alcoholic. As the *Exxon Valdez* exited Valdez Arm, Captain Hazelwood assumed command of the vessel from a harbor pilot and made arrangements to divert the vessel from the normal shipping lanes in order to avoid considerable ice which had calved off Columbia Glacier. That diversion from the standard shipping lanes took the vessel directly toward Bligh Reef. The captain gave the third mate explicit, accurate orders which, if carried out by the third mate, would have returned the vessel to the shipping lanes without danger of grounding on Bligh Reef. The third mate, who had completed the requirements for a captain's license, was, more probably than not, overworked and excessively tired at the time in question. He neglected to commence a turn of the vessel at the point where, and the time when, he had been directed to do so. At that critical time, Captain Hazelwood had left the bridge to attend to paperwork. When the third mate realized that he had proceeded too far in the direction of Bligh Reef, he commenced a turn, but it was too late.

Like so many great tragedies, this one occurred when three or more unfortunate acts and/or omissions took place in close proximity to one another, and but for any one of them, the grounding would likely not have occurred. Joe Hazelwood was under the influence of alcohol. Instead of staying on the bridge to verify that his

---

**9.** Vacating Order No. 358 impliedly leaves Exxon's Renewed Motion for Reduction of Punitive Damages Award, Clerk's Docket No. 7487, unresolved. In light of Exxon's Second Renewed Motion for the Reduction of Punitive Damages, the motion at Clerk's Docket No. 7487 is denied as moot.

**10.** By so stating, the court does not mean that it has adopted plaintiffs' suggestion that *State Farm* breaks no new ground and is limited to the facts of that case. There is new guidance from the Supreme Court; however, there is still no "bright-line" rule as to what is or is not unconstitutional as regards punitive damages. *State Farm*, 123 S.Ct. at 1524. The three *BMW* guideposts still apply.

orders were carried out, he tended to paperwork below. The third mate, being overworked and tired, neglected to carry out the orders which he had been given. The grounding might still have been avoided but for several other converging circumstances: the captain had put the vessel on an automated system for increasing its speed prior to completing the maneuver around the ice in the shipping lane; and the third mate, upon realizing his oversight, did not turn the vessel as sharply as he might have.

It has never been established that there was any design, mechanical, or other fault in the *Exxon Valdez.* It responded to its human masters as intended and expected. Thus it is entirely clear why the *Exxon Valdez* grounded on Bligh Reef: the cause was pure and simple human frailty.

Defendant Exxon Shipping owned the *Exxon Valdez.* Exxon employed Captain Hazelwood, and kept him employed knowing that he had an alcohol problem. The captain had supposedly been rehabilitated, but Exxon knew better before March 24, 1989. Hazelwood had sought treatment for alcohol abuse in 1985 but had "fallen off the wagon" by the spring of 1986. Exxon knew that Hazelwood had relapsed and that he was drinking while on board ship. Exxon officials heard multiple reports of Hazelwood's relapse, and Hazelwood was being watched by other Exxon officers. Yet, Exxon continued to allow Hazelwood to command a supertanker carrying a hazardous cargo. Because Exxon did nothing despite its knowledge that Hazelwood was once again drinking, Captain

Hazelwood was *the* person in charge of a vessel as long as three football fields and carrying 53 million gallons of crude oil. Exxon officials knew that it was dangerous to have a captain with an alcohol problem commanding a supertanker. Exxon officials also knew that oil and fisheries could not mix with one another. Exxon officials knew that carrying huge volumes of crude oil through Prince William Sound was a dangerous business, yet they knowingly permitted a relapsed alcoholic to direct the operation of the *Exxon Valdez* through Prince William Sound.

Captain Hazelwood came to the bridge immediately after the grounding. He timely reported to the United States Coast Guard:

> *Exxon Valdez* [calling Valdez Traffic Control]. We should be on your radar there. We've fetched up hard aground north of Goose Island off Bligh Reef and evidently leaking some oil and we're gonna be here for a while.... [11]

Despite the fact that he was aware of oil boiling up through the seawater on both sides of the vessel, Captain Hazelwood attempted to extract the vessel from the reef.[12] Had he succeeded in backing the vessel off the reef or driving it across the reef, the *Exxon Valdez* would probably have foundered, risking the loss of the entire cargo and the lives of those aboard. However, the vessel was really hard aground. It could wiggle but not be moved off Bligh Reef.

The best available estimate of the crude oil lost from the *Exxon Valdez* into Prince William Sound is about 11 million gallons.[13]

---

11. Plaintiffs' Exhibit 92A, Excerpts of Record, Vol. II—Trial Exhibits, attached to Plaintiffs' Opposition, Clerk's Docket No. 7501.

12. Transcript of Trial Testimony of Joseph J. Hazelwood at 439, Excerpts of Record, Vol. I—Trial Transcript, attached to Plaintiffs' Opposition, Clerk's Docket No. 7501.

13. Throughout these proceedings, plaintiff W. Findlay Abbott has contended that far more than 11 million gallons of crude oil were actually spilled from the *Exxon Valdez* into Prince William Sound. The court has repeatedly rejected these contentions for lack of any substantial evidence to support Mr. Abbott's contentions. For example, his *qui tam*

In the days following the grounding, about 42 million gallons of crude oil were lightered off the *Exxon Valdez* by other tankers. This process was very dangerous. The lightering process was necessarily taking place in a pool of crude oil. A spark from static electricity or other mechanical or electrical sources might have set fire to the crude oil.

The crude oil lost from the *Exxon Valdez* spread far and wide around Prince William Sound, mostly in a westerly direction. Counter-currents which pass through the sound in a westerly direction (the primary North Pacific currents flow from west to east) took the crude oil past numerous islands, spreading to the coast of the Kenai Peninsula, Cook Inlet, and Kodiak Island. As the oil spread, it disrupted the lives and livelihoods of those in its path, including the 32,677 punitive damages class members. Commercial fisheries throughout this area were totally disrupted, with entire fisheries being closed for the 1989 season. As a result, commercial fishermen not only suffered economic losses but also the emotional distress that comes from having one's means of making a living destroyed. A high percentage of commercial fishermen suffered from severe depression, post-traumatic stress disorder, generalized anxiety disorder, or a combination of all three.[14] Subsistence fishing by residents of Prince William Sound and Lower Cook Inlet villages was also disrupted. The disruption to subsistence fishing deeply affected Native Alaskans, for whom subsistence fishing is not merely a way to feed their families but an important part of their culture. Research indicated that Native Alaskans also experienced great emotional distress following the spill.[15] Shore-based businesses dependent upon the fishing industry were also disrupted as were the resources of cities such as Cordova.

In keeping with its legal obligations, Exxon undertook a massive cleanup effort.[16] Approximately $2.1 billion was ultimately spent in efforts to remove the spilled crude oil from the waters and beaches of Prince William Sound, Lower Cook Inlet, and Kodiak Island. Also in accordance with its legal obligations attendant to spilling crude oil,[17] Exxon undertook a voluntary claims program, ultimately paying out $303 million, principally to fishermen whose livelihood was disrupted for the year 1989 and ensuing years up to 1994.

### Proceedings

Litigation over the grounding was soon commenced. The civil suits came first, but developed slowly because of their number and complexity. Both the United States Government and the State of Alaska sued Exxon for environmental damage. That litigation was expeditiously settled by means of consent decrees under which Exxon agreed to pay to the governments,

---

action, *United States ex rel. Abbott v. Exxon Corp.*, No. A96–0041–CV, was dismissed by this court and that dismissal was affirmed by the Ninth Circuit Court of Appeals, 182 F.3d 930 (Table) (1999 WL 313320) (9th Cir.1999). There is no reliable evidence in the record that a larger spill was covered up by Exxon.

**14.** J. Steven Picou and Duane A. Gill, "The *Exxon Valdez* Disaster as Localized Environmental Catastrophe: Dissimilarities to Risk Society Theory" in *Risk in the Modern Age: Social Theory, Science and Environmental De-*

*cisionmaking,* Maurie J. Cohen, ed. (2000) at 160–62, pertinent part attached as Exhibit 6 to Declaration of David W. Oesting, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**15.** *Id.* at 160–61.

**16.** *See* 33 U.S.C. § 1321, which imposes a duty upon an owner or operator of a vessel that spills oil to clean up its discharge.

**17.** AS 46.03.822.

for environmental damage, $900 million over a period of ten years.[18] The decrees contain an "opener" provision, allowing the governments to make additional claims of up to $100 million for environmental damage not known when the settlements were reached.[19]

Captain Hazelwood was prosecuted by the State of Alaska for operating a watercraft while intoxicated, reckless endangerment, negligent discharge of oil, and three felony counts of criminal mischief. That litigation became involved in legal complexities which led to multiple appeals. Some nine years after the grounding, a single misdemeanor conviction for negligent discharge of oil was affirmed on appeal.[20]

Exxon was prosecuted by the federal government for various environmental crimes: violating the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(1); violating the Refuse Act, 33 U.S.C. §§ 407 and 411; violating the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a); violating the Ports and Waterways Safety Act, 33 U.S.C. § 1232(b)(1); and violating the Dangerous Cargo Act, 46 U.S.C. § 3718(b). Exxon Corporation pled guilty to one count of violating the Migratory Bird Treaty Act. Exxon Shipping pled guilty to one count each of violating the Clean Water Act, the Refuse Act, and the Migratory Bird Treaty Act. They were jointly fined $25 million and were ordered to pay restitution in the amount of $100 million.[21]

The civil cases (involving thousands of plaintiffs) were ultimately (but with a few exceptions) consolidated into this case. Municipal claims and some Native corporation claims were tried in state court.[22] In the consolidated cases, there was never any dispute as to Exxon's liability for compensatory damages. Only the amount of the plaintiffs' economic losses was controverted. As a consequence of procedural orders in this case and the excellent, cooperative approach taken by counsel for all parties, an effective and efficient trial protocol for the plaintiffs' claims was developed. As the time for trial grew near, this court became convinced of the necessity of creating a single, punitive damages claims class. On April 14, 1994, the court granted conditional final approval of a mandatory punitive damages class, consisting

> of all persons or entities who possess or have asserted claims for punitive damages against Exxon and/or Exxon Shipping which arise from or relate in any

18. *United States v. Exxon Corp.*, No. A91–0082–CV (Clerk's Docket No. 46 at 7–8), and *Alaska v. Exxon Corp.*, No. A91–0083–CV (Clerk's Docket No. 26 at 7–8).

19. *See* Consent Decree and Agreement at 18–19, Clerk's Docket No. 46 in *United States v. Exxon Corp.*, No. A91–0082–CV, and Clerk's Docket No. 26 in *Alaska v. Exxon Corp.*, No. A91–0083–CV.

20. *State v. Hazelwood*, 946 P.2d 875 (Alaska 1997); *State v. Hazelwood*, 866 P.2d 827 (Alaska 1993); and *Hazelwood v. State*, 962 P.2d 196 (Alaska Ct.App.1998).

21. *See* Judgments at Clerk's Docket Nos. 235 and 236 in *United States v. Exxon Corp.*, No. A90–0015–CR.

22. More or less simultaneously with the trial in this case, a state court civil trial involving several Native corporations was conducted. The jury awarded the corporations almost $6 million in damages. *Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 774 (Alaska 1999). The trial court offset pretrial settlements and payments against the jury award. *Id.* at 775. Because the pretrial payments exceeded the jury award, final judgments were entered by which the corporations "took nothing" from Exxon. *Id.* Recently, a straggling case involving six Alaska communities was tried in state court to a defense verdict. The cities were unsuccessful in their efforts to recover from Exxon for alleged additional expenses incurred by them as a consequence of the oil spill.

way to the grounding of the EXXON VALDEZ or the resulting oil spill.[23]

By agreement with the parties, trial as regards Exxon's and Captain Hazelwood's liability for punitive damages was commenced on May 2, 1994. In this Phase I of the trial, the jury found Exxon and Captain Hazelwood to be liable for punitive damages.

Phase II of the trial dealt with compensatory damages for plaintiffs' economic losses. In Phase IIA, the jury returned a verdict in favor of the fishermen in the amount of $287 million. Phase IIB, a separate aspect of the compensatory claims having to do with the Native economic claims, was settled without trial for $22.6 million.

Phase III of the trial focused upon the amount of punitive damages which should be imposed upon the defendants. As a predicate or base for the punitive damages trial, the parties entered into a stipulation regarding impacts from the oil spill which was read to the jury at the beginning of Phase III.[24] The stipulation outlined the actual damages that had been resolved in Phase IIB of the trial and the actual damages that were to be resolved in Phase IV of the trial and in Alaska state court proceedings. The damage estimates outlined in the stipulation exceeded $350 million. The jury was, of course, also aware that it had awarded $287 million in damages in Phase IIA of the trial. The evidence presented during Phase III focused on Exxon's and Hazelwood's conduct as it related to the oil spill. While evidence of extraterritorial conduct was admitted,[25] it had a nexus to the grounding of the *Exxon Valdez* and the resulting oil spill.

In consultation with counsel, unusually detailed punitive damages instructions were developed for purposes of this case. The jury was instructed that punitive damages are awarded for the purposes of punishment and deterrence,[26] and that the fact that it had found the defendants' conduct reckless did not require it to award punitive damages.[27] The jury was specifically instructed to use reason in setting the amount of punitive damages and that any award of punitive damages should bear a reasonable relationship to the harm caused the members of the plaintiff class by the defendants' misconduct.[28] The jury was

---

**23.** Order No. 204 (granting conditional final approval and certifying mandatory punitive damages class) at 2, Clerk's Docket No. 4856.

**24.** *See* Clerk's Docket No. 5634.

**25.** For example, evidence of Hazelwood drinking in parts of the country other than Valdez, Alaska, was admitted.

**26.** *See* Jury Instruction No. 22:

The purposes for which punitive damages are awarded are:
(1) to punish a wrongdoer for extraordinary misconduct; and
(2) to warn defendants and others and deter them from doing the same.
Clerk's Docket No. 5890.

**27.** *See* Jury Instruction No. 20, which in pertinent part, reads: "The fact that you have determined that the conduct of Joseph Hazel-wood and of the Exxon defendants was reckless does not mean that you are required to make an award of punitive damages against either one or both of them." Clerk's Docket No. 5890.

**28.** *See* Jury Instruction No. 25, which in pertinent part reads:

the amount of punitive damages may not be determined arbitrarily. You must use reason in setting the amount. . . . [A]ny punitive damages award must have a rational basis in the evidence in the case. A punitive damages award may not be larger than an amount that bears a reasonable relationship to the harm caused to members of the plaintiff class by a defendant's misconduct. . . . Also, the award may not be larger than what is reasonably necessary to achieve society's goals of punishment and deterrence.
Clerk's Docket No. 5890.

instructed that punitive damages are not intended to provide compensation for plaintiffs' losses and that they should assume that the plaintiffs had been fully compensated for the damages that they had suffered as a result of the oil spill.[29] Factors that the jury was told it could consider in setting an amount of punitive damages included the reprehensibility of the defendants' conduct,[30] the amount of actual and potential harm suffered by the members of the plaintiff class as a result of the defendants' conduct, and the financial condition of the defendants.[31] As to the reprehensibility factor, the jury was instructed that in determining the reprehensibility of the defendants' conduct it could consider "the nature of the conduct, the duration of the conduct, and defendant's awareness that the conduct was occurring."[32] As to the defendants' wealth, the jury was instructed to consider the defendants' financial condition only in terms of what level of award would be necessary to achieve punishment and deterrence.[33]

The jury was instructed that it should not count any damage to natural resources or the environment in general when assessing the harm suffered by members of the plaintiff class.[34] The jury was also instructed that it could consider as mitigating factors the existence of criminal fines or civil awards against the defendants for the same conduct and the extent to which the defendants had taken steps to remedy the consequences of the oil spill[35] and to

---

29. *See* Jury Instruction No. 26, which reads:
 An award of punitive damages is not intended to provide compensation for any loss suffered by any plaintiff. In determining whether to make an award of punitive damages you should assume that all plaintiffs have been or will be fully compensated for all damages they may have suffered as a result of the oil spill. You may not make an award of punitive damages for the purpose of compensating any plaintiff.
 Clerk's Docket No. 5890.

30. The jury was instructed, however, that "[t]he fact that you have found a defendant's conduct to be reckless does not necessarily mean that it was reprehensible...." *See* Jury Instruction No. 30, Clerk's Docket No. 5890.

31. *See* Jury Instruction No. 27, which reads in pertinent part:
 In determining the amount of punitive damages to award, if any, you may consider, among other factors:
 (a) the degree of reprehensibility of the defendants' conduct,
 (b) the magnitude of the harm likely to result from the defendants' conduct, as well as the magnitude of the harm that has actually occurred, and
 (c) the financial condition of the defendants.
 Clerk's Docket No. 5890.

32. Jury Instruction No. 30, Clerk's Docket No. 5890.

33. *See* Jury Instruction No. 32, which reads:
 In considering whether an award of punitive damages is appropriate in this case and, if so, in what amount, you may consider the financial condition of a defendant. This does not necessarily mean that you should punish one defendant more than another defendant simply because of their relative financial conditions. If you find that a defendant's financial condition affects the level of award necessary to punish the defendant and to deter future wrongful conduct by that defendant and others, you may take the defendant's financial condition into account for that purpose.
 Clerk's Docket No. 5890.

34. *See* Jury Instruction No. 29, which reads in pertinent part: "In determining the harm caused by the oil spill, you should not consider any damage to natural resources or to the environment generally[.]" Clerk's Docket No. 5890.

35. *See* Jury Instruction No. 36, which reads in pertinent part:
 In considering whether an award of punitive damages is appropriate in this case, and, if so, in what amount, you may consider whether a defendant has paid other criminal fines or civil penalties. You may also consider whether a defendant has made payments for compensatory damages, settlements, and incurred other costs and

prevent another oil spill.[36]

The Phase III trial was relatively short, lasting only five days, but the jury deliberated for approximately twenty-two days before returning a verdict. The jury awarded a breath-taking $5 billion in punitive damages against the Exxon defendants, and $5,000 against Captain Hazelwood.

There was to be a Phase IV of the civil litigation. The Phase IV claims embodied all of the compensatory damage claims remaining in federal court and not included in Phase II. As to these claims, a settlement was reached in the amount of $13.4 million.

Exxon moved for a reduction or remittitur of punitive damages.[37] That motion was denied.[38] The court applied the *Hammond* factors to reach its conclusion that the $5 billion punitive damages award was

not so grossly excessive as to violate Exxon's due process rights.[39] After lengthy other proceedings not relevant now, final judgment was entered including the award of $5 billion in punitive damages.[40]

### *Appeal and Remands*

Exxon appealed as to liability for and the amount of punitive damages. Exxon sought and obtained a stay of execution on the judgment for punitive damages by posting a *supersedeas* bond in the amount of $6,750,000,000.[41] On appeal, Exxon contended first that punitive damages should have been barred as a matter of law. For reasons given, the court of appeals rejected this contention, concluding that:

> the Clean Water Act does not preempt a private right of action for punitive as well as compensatory damages for damage to private rights. . . . [W]hat saves plaintiff's case from preemption is that

---

expenses of remedial measures. You may also consider the extent to which a defendant has been subjected to condemnation or reproval by society as a result of other means, such as loss of standing in the community, public vilification, loss of reputation, and similar matters. Clerk's Docket No. 5890.

**36.** *See* Jury Instruction No. 35, which reads in pertinent part, that "[i]n considering whether an award of punitive damages is appropriate in this case, and, if so, in what amount, you should consider steps taken by a defendant to prevent recurrence of the conduct in question—in this case, another oil spill." Clerk's Docket No. 5890.

**37.** Clerk's Docket No. 5970.

**38.** Clerk's Docket No. 6234.

**39.** The Supreme Court, in *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), indicated that the *Hammond* factors were useful in assessing the reasonableness of a punitive damages award. The *Hammond* factors are as follows:
(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the de-

fendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation. *Haslip*, 499 U.S. at 21–22, 111 S.Ct. 1032.

**40.** Judgment as to Phases I and III was entered September 16, 1994. Clerk's Docket No. 5891. That judgment was vacated. Clerk's Docket No. 6055. A final judgment was entered September 24, 1996, Clerk's Docket No. 6911, and an amended judgment was entered January 30, 1997, Clerk's Docket No. 6966.

**41.** Clerk's Docket No. 6914.

the $5 billion award vindicates only private economic and quasi-economic interests, not the public interest in punishing harm to the environment.

*In re Exxon Valdez*, 270 F.3d at 1231.

Exxon's second contention was that the plaintiffs' burden of proof should be to produce clear and convincing evidence of liability for punitive damages. The court of appeals held that this court did not abuse its discretion by employing the preponderance of evidence standard. *Id.* at 1232–33. Similarly, this court was affirmed as regards its instructions to the jury concerning Exxon's vicarious liability for the conduct of its employees. *Id.* at 1235. Exxon did not challenge the substance of the court's instructions as to the determination of punitive damages; for, with prescient skill, counsel for plaintiffs and Exxon had proposed instructions which appropriately informed the jury as to what have become the "guideposts" for fixing punitive damages: the reprehensibility of defendant's conduct, the relationship of punitive damages to actual and potential harm, and comparison to other penalties.

Captain Hazelwood and Exxon both challenged the sufficiency of the evidence to support an award of punitive damages against them. The Ninth Circuit Court concluded that there was substantial evidence to support a jury verdict of liability for punitive damages as to both Captain Hazelwood and Exxon. *Id.* at 1237–38.

Finally, with liability concluded, the court of appeals turned to Exxon's challenge to the amount of the punitive damages award against it. In addition to passing muster under the sufficiency of the evidence test, punitive damages awards must be subjected to a due process analy-

sis which flows from the decision of the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In *BMW*, the Supreme Court held that a $2 million punitive damages award[42] based upon $4,000 in compensatory damages for pure economic loss was unconstitutional because the defendant lacked fair notice of so severe a punitive award. *Id.* at 574–75, 116 S.Ct. 1589. The importance of the *BMW* guideposts in determining the outer constitutional limits of punitive damages was reinforced in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

Based upon *BMW*, the Ninth Circuit Court of Appeals in this case reiterated the three guideposts established by the Supreme Court for use in determining whether punitive damages are so grossly excessive as to constitute a violation of due process. The guideposts are:

(1) the reprehensibility of the defendant's conduct; (2) the ratio of the award to the harm inflicted on the plaintiff; and (3) the difference between the award and the civil or criminal penalties in comparable cases.

*In re Exxon Valdez*, 270 F.3d at 1240. The court of appeals recognized that this court did not have the benefit of *BMW* and *Cooper Industries* when it decided Exxon's original motion to reduce the punitive damages award and remanded the case "for the district court to consider the constitutionality of the amount of the award in light of the guideposts established in *BMW*." *Id.* at 1241. However, the court of appeals also provided its analysis of the *BMW* factors to aid the court in its consideration of the constitutional question. *Id.*

**42.** The jury awarded Dr. Gore $4 million in punitive damages, which the Alabama Su- preme Court reduced to $2 million.

In the end, the court of appeals unequivocally told this court that "[t]he $5 billion punitive damages award is too high to withstand the review we are required to give it under *BMW* and *Cooper Industries*" and "[i]t must be reduced." *Id.* at 1246 (citations omitted).

On remand, Exxon filed a renewed motion for reduction or remittitur of the punitive damages award,[43] which plaintiffs opposed.[44] After consideration of the briefing and hearing oral argument on the renewed motion, the court, on December 6, 2002, issued Order No. 358, which granted Exxon's renewed motion and reduced the punitive damages award to $4 billion.[45] In applying the *BMW* guideposts, the court found Exxon's conduct highly reprehensible, a ratio of 9.85-to-1 based on actual and potential harm of over $507 million, and comparable civil and criminal penalties of which Exxon was on notice in excess of $5 billion. The court concluded that application of the *BMW* guideposts supported the $5 billion punitive damages award but reduced the award to $4 billion because the Ninth Circuit had mandated that the award be reduced.

Judgment on the $4 billion punitive damages award was entered on December 10, 2002.[46] Plaintiffs moved for an order directing entry of a final judgment on Order No. 358 or, in the alternative, an order authorizing an interlocutory appeal.[47] On January 27, 2003, the court granted the plaintiffs' motion.[48] Both Exxon and plaintiffs timely noticed appeals to the Ninth Circuit Court of Appeals. Exxon sought

and obtained a stay of execution on the judgment by posting a *supersedeas* bond in the amount of $4,806,000,000.[49]

On April 7, 2003, the Supreme Court decided *State Farm*, 538 U.S. 408, 123 S.Ct. 1513, which addressed the question of whether a $145 million punitive damages award, compared to compensatory damages of $1 million, in an insurance bad faith case was grossly excessive and violated due process. The Court held that the $145 million punitive damages award did not comport with due process and remanded the case to the Utah Supreme Court with the suggestion that, under the circumstances of the case, a punitive damages award at or near the amount of compensatory damages would comport with due process. *Id.* at 1526.

On August 18, 2003, prior to briefing on either appeal, the Ninth Circuit Court of Appeals vacated the $4 billion punitive damages judgment and again remanded the case to this court, this time to reconsider the punitive damages award in light of *State Farm*.[50] In remanding, the court of appeals simply vacated the court's amended judgment which found plaintiffs entitled to $4 billion in punitive damages against Exxon. The court of appeals did not comment on the merits of Order No. 358, neither suggesting nor implying that the court should revise Order No. 358, although the court of appeals plainly intended that this court reconsider Order No. 358 in light of *State Farm*. In remanding, the court of appeals also did not disturb its earlier holding that the $5 billion

**43.** Clerk's Docket No. 7487.

**44.** Clerk's Docket No. 7501.

**45.** Clerk's Docket No. 7564.

**46.** Clerk's Docket No. 7566.

**47.** Clerk's Docket No. 7569.

**48.** Order No. 359 (granting Motion for Rule 54(b) Determination) (Jan. 27, 2003), Clerk's Docket No. 7589.

**49.** Clerk's Docket No. 7622.

**50.** *See* Order, Clerk's Docket No. 7737.

punitive damages award was too high to pass constitutional muster.

On remand, this court called for supplemental briefing from the parties to aid in its reconsideration of the punitive damages award in light of *State Farm*.[51] Exxon submitted its supplemental briefing in the form of a second renewed motion for reduction or remittitur of punitive damages.[52] This motion is opposed by plaintiffs.[53] Oral argument on the second renewed motion for reduction or remittitur of punitive damages was heard on December 3, 2003. Having considered the parties' arguments, both written and oral, the court turns, for a third time, to the question of whether the $5 billion punitive damages award against Exxon offends the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

### Discussion

### Legal Background

■ It has long been understood "that the Due Process Clause of the Fourteenth Amendment imposes substantive limits 'beyond which penalties may not go.'" *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 453–54, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (quoting *Seaboard Air Line Ry v. Seegers*, 207 U.S. 73, 78, 28 S.Ct. 28, 52 L.Ed. 108 (1907)). It was not, however, until recent years that the Supreme Court considered applying this general principle of constitutional law to punitive damages awards.

In *Browning–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276–77, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), the Supreme Court suggested that the Due Process Clause could place substantive limits on punitive damages awards but left the question of whether it did to another day because the parties had not raised the issue below. *Id.*

That day came two terms later in *Haslip*, 499 U.S. 1, 111 S.Ct. 1032. *Haslip* involved the misappropriation of insurance premiums by Pacific Mutual's agent. After their insurance lapsed because of nonpayment of premiums, Haslip and others brought a fraud claim against the agent and also sought to hold Pacific Mutual liable on a *respondeat superior* theory. A jury awarded Haslip $200,000 in compensatory damages and $840,000 in punitive damages.[54] *Id.* at 6–7 and n. 2, 111 S.Ct. 1032. Pacific Mutual challenged Haslip's punitive damages award arguing that it violated both substantive and procedural due process.

The Supreme Court rejected Pacific Mutual's argument that its substantive due process rights were violated by the imposition of liability based upon the *respondeat superior* doctrine. The Court also determined that the common-law method of determining punitive damages is not "so inherently unfair as to deny due process and be *per se* unconstitutional." *Id.* at 17, 111 S.Ct. 1032. However, the Court emphasized that a punitive damages award that was the result of unlimited jury or judicial discretion could violate the Due Process Clause. *Id.* at 18, 111 S.Ct. 1032.

The Court in *Haslip* refused to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable...." *Id.* Rather, the Court stated that punitive damages awards should be evaluated based upon "general

---

**51.** Order re Further Proceedings on Punitive Damages Award (Aug. 26, 2003), Clerk's Docket No. 7714.

**52.** Clerk's Docket No. 7753.

**53.** Clerk's Docket No. 7767.

**54.** The other three plaintiffs were awarded much smaller amounts of damages ($15,290; $12,400; and $10,288).

concerns of reasonableness and adequate guidance from the court when the case is tried to a jury...." *Id.* The Court then concluded that the punitive damages award against Pacific Mutual did not violate the Due Process Clause because: (1) the jury had been adequately instructed and was not given unlimited discretion in setting the amount of punitive damages; (2) the trial court was required to do a post-trial review of the punitive damage award for excessiveness; and (3) the Alabama Supreme Court also conducted a post-verdict review of punitive damages awards, using the *Hammond* factors. *Id.* at 191–22, 111 S.Ct. 1032.

The Court observed that Haslip's punitive damages award was more than four times her compensatory damages and much greater than any fine that could have been imposed for insurance fraud under Alabama law but found that the award, although perhaps "close to the line", *id.* at 23, 111 S.Ct. 1032, did "not cross the line into the area of constitutional impropriety." *Id.* at 24, 111 S.Ct. 1032.

Two terms later, in *TXO*, 509 U.S. 443, 113 S.Ct. 2711, the Court again took up the issue of the constitutionality of a punitive damages award, this time a $10 million punitive damages award in a slander of title case that was 526 times the compensatory damages award. The parties urged the Supreme Court to formulate a "test" for evaluating whether a punitive damages award violated due process. The Court refused to do so, instead returning to what it had said in *Haslip:*

> "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus."

*Id.* at 458, 113 S.Ct. 2711 (quoting *Haslip,* 499 U.S. at 18, 111 S.Ct. 1032).

In evaluating the reasonableness of the $10 million punitive damages award against TXO, the Court concluded that it was appropriate not only to consider the actual harm that a defendant's conduct caused a plaintiff but also the potential harm that may have resulted from the defendant's conduct. *Id.* at 460, 113 S.Ct. 2711. TXO's pattern of behavior could have resulted in damages ranging from $5 million to $8.3 million. *Id.* at 461, 113 S.Ct. 2711. Considering the "potential" harm, the Court found that "the dramatic disparity between the actual damages and the punitive award [was not] controlling...." *Id.* at 462, 113 S.Ct. 2711.

TXO also challenged the punitive damages award on the grounds that the jury had not been adequately instructed. The Court noted that the jury had been instructed that it could consider the wealth of TXO "in recognition of the fact that effective deterrence of wrongful conduct 'may require a larger fine upon one of large means than it would upon one of ordinary means under the same or similar circumstances.'" *Id.* at 463, 113 S.Ct. 2711 (quoting the punitive damages jury instruction). The jury was also instructed that one of the purposes of punitive damages was to provide additional compensation to the injured parties.

The Court agreed with TXO that reference to TXO's wealth may have increased the risk of the jury being influenced by prejudice against a large non-resident defendant but noted that it had found in *Haslip* that the wealth of the defendant could be considered when assessing punitive damages. The Court also stated that it did not understand the reference in the instructions about "additional compensation". However, because the issue of inadequate instructions had not been raised

below, the Court did not consider what effect these jury instructions might have had on the punitive damages award.

The Supreme Court next considered the constitutionality of a punitive damages award in *Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994). Oberg was severely injured in an accident involving a three-wheeled all-terrain vehicle that was manufactured and sold by Honda. The jury awarded Oberg $735,512.31 in compensatory damages and $5 million in punitive damages. Honda appealed, arguing that the punitive damages award violated due process, in large part, because Oregon courts had no power to reduce a punitive damages award if they found that the amount of the award was grossly excessive. The Court held "that Oregon's denial of judicial review of the size of punitive damages awards violates the Due Process Clause of the Fourteenth Amendment."[55] *Id.* at 432, 114 S.Ct. 2331.

Then came *BMW*, 517 U.S. 559, 116 S.Ct. 1589, in which the Court provided lower courts with a more definite means for analyzing the reasonableness of a punitive damages award. In *BMW*, Dr. Gore purchased a new BMW from a Birmingham, Alabama, dealer. Pursuant to a national BMW policy, the dealer did not disclose to Dr. Gore that the car had been repainted because the cost of this "repair" was less than three percent of the car's suggested retail value.

At trial, BMW admitted that its national policy since 1983 was to not disclose repairs to new cars if the repairs cost less than three percent of the car's suggested retail price. Dr. Gore presented evidence that since 1983 BMW had sold 983 "repaired" cars as new, including fourteen in

Alabama. Dr. Gore also presented evidence that the value of a repainted car was ten percent less than a car that had not been repainted.

The jury awarded Dr. Gore $4,000 in compensatory damages and $4 million in punitive damages (apparently based on 1000 cars × $4000 in actual damages per car). BMW moved to set aside the punitive damages award, but the trial court denied the motion. On appeal to the Alabama Supreme Court, the punitive damages award was reduced to $2 million.

In reviewing the $2 million punitive damages award, the United States Supreme Court stated that "the federal excessiveness inquiry appropriately begins with an identification of the state interests that a punitive award is designed to serve." *BMW*, 517 U.S. at 568, 116 S.Ct. 1589. The Court observed that there could be no doubt that Alabama had a legitimate interest in protecting its citizens from deceptive trade practices. *Id.* at 568–69, 116 S.Ct. 1589. However, it was conceded that Dr. Gore was endeavoring to achieve national punishment and deterrence. For reasons explained, the Supreme Court held that Alabama's interests, not those of the entire nation, were the proper scope of deterrence and punishment. *Id.* at 573–74, 116 S.Ct. 1589.

The Court then announced the three guideposts that lower courts are to use to determine whether a punitive damages award is grossly excessive and applied them to the punitive damages award against BMW. The Court held that the $2 million punitive damages award against BMW violated due process and remanded the case to the Alabama Supreme Court.[56] *Id.* at 585–86, 116 S.Ct. 1589.

---

55. On remand, the Oregon Supreme Court, after engaging in a due process analysis, upheld the $5 million punitive damages award. *Oberg v. Honda Motor Co.*, 320 Or. 544, 888 P.2d 8 (1995).

56. On remand, the punitive damages award was reduced to $50,000. *See BMW of North America, Inc. v. Gore*, 701 So.2d 507 (Ala. 1997).

After *BMW*, the Supreme Court did not consider a punitive damages/due process case until its 2001 decision in *Cooper Industries*, 532 U.S. 424, 121 S.Ct. 1678, in which the issue was "whether the Court of Appeals applied the wrong standard of review in considering the constitutionality of the punitive damages award." *Id.* at 426, 121 S.Ct. 1678. The Ninth Circuit Court of Appeals had applied an abuse of discretion standard; the Supreme Court reversed, holding that the constitutionality of punitive damages required *de novo* review and remanded the case to the appellate court to apply the appropriate standard. *Id.* at 431, 121 S.Ct. 1678. Although the constitutional issue was not before the Court, it nonetheless applied the *BMW* guideposts and found several potential problems with a punitive damages award of $4.5 million versus a compensatory damages award of $50,000 for violations of the Lanham Act based on Cooper Industries passing off its product as Leatherman's.[57]

For the next several years, lower courts grappled with applying the *BMW* guideposts to punitive damages awards with no additional guidance from the Supreme Court. Then, last term, the Court handed down its decision in *State Farm*, 538 U.S. 408, 123 S.Ct. 1513. *State Farm* arose out of a serious traffic accident in 1981, in which, one person (Ospital) was killed and one (Slusher) was permanently disabled. The accident occurred when Curtis Campbell was attempting to pass six vans. Early investigation into the accident indicated that Campbell's unsafe pass was the cause of the accident. A wrongful death and tort action was brought against Campbell. Campbell insisted that he was not at fault and his insurer, State Farm, decided to contest liability and declined offers to set-

tle the claims against Campbell for policy limits ($25,000 per person, $50,000 total).

The case went to trial and ended with a judgment against Campbell for $185,849, which was in excess of the amount offered in settlement. State Farm refused to cover the excess or to assist Campbell in an appeal. Campbell hired his own counsel to appeal and during the appeal reached a settlement with the plaintiffs in the tort case by which they agreed not to seek satisfaction of the judgment against Campbell if Campbell would pursue a bad faith action against State Farm.

In 1989, the Utah Supreme Court denied Campbell's appeal. State Farm then paid the entire judgment, including the excess. Nonetheless, Campbell and his wife filed suit against State Farm alleging bad faith, fraud, and intentional infliction of emotional distress.

The trial court granted summary judgment to State Farm but was reversed on appeal. On remand, the case was bifurcated for trial. In the first phase of the trial the jury determined that State Farm's decision to not settle was unreasonable. Phase two of the trial addressed, among other issues, compensatory and punitive damages. During phase two, the Campbells were allowed to introduce evidence of " 'a national scheme [by State Farm] to meet corporate fiscal goals by capping payouts on claims company wide.' " *Id.* at 1518 (quoting *Campbell v. State Farm Mutual Auto. Ins. Co.*, 65 P.3d 1134, 1143 (Utah 2001)). This evidence concerned State Farm's business practices for over 20 years in numerous states. Many of the practices had no connection to third-party automobile claims, which was the type of claim underlying the complaint against the Campbells. In addition, some of the out-of-

---

**57.** On remand, the Ninth Circuit Court of Appeals reduced the punitive damages award to $500,000. *See Leatherman Tool Group,*

*Inc. v. Cooper Industries, Inc.*, 285 F.3d 1146 (9th Cir.2002).

state conduct was legal where it occurred. The jury awarded the Campbells $2.6 million in compensatory damages and $145 million in punitive damages. The trial court reduced the compensatory damages to $1 million and the punitive damages to $25 million.

On appeal, the Supreme Court of Utah applied the *BMW* guideposts and reinstated the $145 million punitive damages award (but left compensatory damages at $1 million). State Farm successfully petitioned for certiorari.

The United States Supreme Court began its analysis, as it had in *BMW*, with a discussion of how the two aims of punitive damages, deterrence and retribution, fit into the concept that grossly excessive or arbitrary punitive damages awards offend due process. The Court observed that "it is well established that there are procedural and substantive constitutional limitations" on punitive damages awards. *State Farm*, 123 S.Ct. at 1519. The Court further observed that although punitive damages serve the same purpose as criminal penalties, defendants in civil cases are not afforded the same protections as criminal defendants. The Court stated that "[t]his increases our concerns over the imprecise manner in which punitive damages systems are administered." *Id.* at 1520. The Court discussed the need to properly instruct juries concerning punitive damages. *Id.* The Court continued by remarking that "[o]ur concerns are heightened when the decisionmaker is presented ... with evidence that has little bearing as to the amount of punitive damages that should be awarded." *Id.*

The Court then turned its attention to the application of the *BMW* guideposts, observing that "this case is neither close nor difficult." *Id.* at 1521. The Court held that the $145 million punitive damages award violated due process and re-

manded the case to the Utah Supreme Court, stating:

> An application of the [*BMW*] guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages.

*Id.* at 1526.

### The Question Presented

■ The question presented by the instant motion is the same question that was presented in *Haslip, TXO, BMW,* and *State Farm:* does the punitive damages award constitute "grossly excessive or arbitrary punishment[ ] on [Exxon]" in violation of the Due Process Clause of the Fourteenth Amendment? *State Farm,* 123 S.Ct. at 1520 (citing *Cooper Industries,* 532 U.S. at 433, 121 S.Ct. 1678, and *BMW,* 517 U.S. at 562, 116 S.Ct. 1589). The question is not whether the jury "got it right" as to the necessary and/or appropriate level of punishment and/or deterrence *per se.* Discussions of whether the award sufficiently "got" Exxon's attention or whether the costs of the cleanup of the oil spill were a sufficient deterrence have little place in the constitutional analysis. We engage in a judicial (as opposed to lay judgment) review of the fundamental fairness of the punitive damages award. We consider whether Exxon was fairly on "notice not only of the conduct that will subject [it] to punishment, but also of the severity of the penalty...." *BMW,* 517 U.S. at 574, 116 S.Ct. 1589. That analysis is a forward-looking inquiry from Exxon's point of view *prior* to the grounding of the *Exxon Valdez.* The Supreme Court has not said this expressly, but the forward-looking nature of the inquiry is necessarily implicit in the concept of fair notice to Exxon, *i.e.,* what Exxon should reasonably

have perceived as the likely consequences of its conduct. It is because of this aspect of the inquiry that we are to look at not only actual harm but also potential harm which a defendant's reckless conduct could foreseeably have caused. *TXO,* 509 U.S. at 460, 113 S.Ct. 2711.

■■ The fair notice inquiry requires that the court first look at the quality of Exxon's conduct. Any reasonable person will understand that the more heinous his conduct, the more severe the punishment will be. Next, we look at the harm which a reasonable person would anticipate likely to flow from his conduct. This includes potential harm because a reasonable person analyzing the consequences of his conduct would naturally look to not only what is sure to happen but also to what could possibly happen. Finally, we look at other sanctions that can be imposed because the *maxima* in these regards are the very kind of thing that a reasonable person would think about if he were evaluating the possible consequences of his conduct.

■ In sum, the question before us is whether, under the circumstances of this case, an award of $5 billion in punitive damages is grossly excessive and therefore violates due process. To answer that question, the court's inquiry is two-fold: (1) the court must identify the state interests that the $5 billion punitive damages award was designed to serve, and (2) the court must apply the *BMW* guideposts in light of *State Farm.*

### Punishable Interests

In *BMW,* the Court instructed that "the federal excessiveness inquiry appropriately begins with an identification of the state interests that a punitive award is designed to serve." *BMW,* 517 U.S. at 568, 116 S.Ct. 1589. Without saying so expressly, *State Farm* suggests that this is still the first step in the due process evaluation of a punitive damages award. *State Farm,* 123 S.Ct. at 1519–20. In both *BMW* and *State Farm,* the plaintiffs were endeavoring to achieve national punishment and deterrence. In *BMW,* for reasons explained, the Supreme Court held that Alabama's interests, not those of the entire nation, were the proper scope of deterrence and punishment. *BMW,* 517 U.S. at 573–74, 116 S.Ct. 1589. In *State Farm,* the Court reiterated that punitive damages are not to be used to punish and deter a defendant for conduct that happened in another jurisdiction, particularly if the conduct is legal in the jurisdiction in which it occurred. *State Farm,* 123 S.Ct. at 1522–23.

■ Most of the courts considering the constitutionality of punitive damages awards have ignored this first step in the analysis. In *In re Exxon Valdez,* the Ninth Circuit Court did not expressly discuss the scope of interests which plaintiffs seek to vindicate.[58] That it would not have done so probably flows directly from the circumstances of this case. The plaintiffs' claims for punitive damages expressly excluded consideration of harm to the environment. These claims were pursued and vindicated by consent decrees in favor of the State of Alaska and the United States Government in other proceedings. Here, the plaintiffs' focus has always been upon what happened in Prince William Sound, Lower Cook Inlet, and the environs of Kodiak Island. While brought under both state and federal law, the focus of plain-

---

**58.** Both the Tenth and Eleventh Circuits have expressly stated that *BMW* requires a two-step analysis: (1) define the scope of the legitimate state interests the punitive award is intended to further and (2) apply the three *BMW* guideposts. *Smith v. Ingersoll–Rand Co.,* 214 F.3d 1235, 1252–53 (10th Cir.2000); *Johansen v. Combustion Engineering, Inc.,* 170 F.3d 1320, 1333 (11th Cir.1999). The Ninth Circuit did the same in a case that was decided after *In re Exxon Valdez. See White v. Ford Motor Co.,* 312 F.3d 998, 1013 (9th Cir.2002).

tiffs' complaints have always had to do with harm to Alaska fisheries, Alaska businesses, Alaska property (both real and personal), and, to the extent that potential claims have been involved, they too have Alaskan roots. No one has contended that Exxon should be deterred or that it should be punished for conduct not having a direct nexus with the grounding of the *Exxon Valdez* on Bligh Reef in Prince William Sound.

Before moving on, and as a part of the first phase of the constitutional analysis, further comment about the court's instructions on punitive damages may be in order. The Supreme Court's punitive damages jurisprudence has consistently emphasized the role of adequate jury instructions in ensuring punitive damage awards that comport with due process. As discussed above, in *State Farm*, the Supreme Court reiterated its concern about quasi-criminal awards being made without the protections applicable to criminal cases and without adequate instructions that properly limit the jury's discretion. *State Farm*, 123 S.Ct. at 1520.

Here, given the jurisprudential changes which took place between the time this court first evaluated the $5 billion punitive damages award and the Ninth Circuit Court's review of the same, there could have been an absence of appropriate instructions to the jury or inadequate instructions as to how punitive damages should be determined by the jury.[59] As discussed above, Exxon had its opportunity for input to those instructions, its opportunity to challenge those instructions, and we all have the results of that inquiry before us at the present time. The court's substantive jury instructions as to the determination of punitive damages were unchallenged. Nevertheless, given the nature of the present inquiry, it strikes the

court as important to know and be mindful in understanding the second phase of the constitutional analysis (the guideposts) that the trial jury in this case was working with the very same concepts embodied within the *BMW* guideposts as set out above. The jury was instructed on the purpose of punitive damages: punishment and deterrence. The jury was admonished not to be arbitrary: punitive damages must have a rational basis in the record and bear a reasonable relationship to harm done or likely to result from the defendant's conduct. The jury was also instructed on the subjects of reprehensible conduct and consideration of mitigation (as by voluntary payments) and some comparison to other available sanctions.

██ Without proper instructions, jury verdicts are patently suspect. Here, we know that the trial jury, in making an award of $5 billion for punitive damages, was seeking to vindicate—through punishment and deterrence—the appropriate, Alaska-oriented plaintiff interests, and not other interests such as environmental concerns which had been separately dealt with and which the jury was expressly told not to consider. In short, this is not a situation where the jury awarded $5 billion in punitive damages based upon one script, with this court second-guessing the jury's work using a different script.

Finally, this court was concerned before trial about the risk of multiple punitive damages awards based upon the same incident. Even when punitive damages awards are limited to matters in which there is a proper Alaska interest, they could be arbitrarily cumulative and in sum grossly excessive. Here, Exxon was exposed to a multiplicity of claims, most but not all of which were pending in this court.

---

**59.** Both now and when this case was tried, Ninth Circuit pattern jury instructions on pu-

nitive damages are not adequate to meet the concern expressed in *State Farm*.

But for the creation of a mandatory punitive damages class, Exxon was exposed to the risk of multiple punitive damages awards flowing from the same incident.[60] Where multiple suits for punitive damages have been brought in a single jurisdiction, it strikes this court that there is a very real risk that two punitive damages awards in different courts, but based upon the same incident, could result in a doubling up on deterrence and punishment. How this concern should be managed under *BMW* and *State Farm* is not clear. What is clear is that the risk does not exist in this case. Because of the mandatory punitive damages class, the court can say with confidence that Exxon has not been exposed to grossly excessive deterrence or punishment because of multiple suits for punitive damages based upon the same harm or course of conduct. It follows that the whole of what is constitutionally foreseeable for purposes of due process is fairly put to the *BMW* test of whether $5 billion in punitive damages was or was not grossly excessive.

In consideration of the foregoing, this court concludes that the plaintiffs in making their claims, this court in instructing the jury, and the jury in awarding punitive damages, were all focused upon the appropriate, relevant Alaska interests for which deterrence and punishment through punitive damages is permissible.

### Application of BMW Guideposts

■ *Reprehensibility.* In *BMW,* the Court stated that *"[p]erhaps* the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW,* 517 U.S. at 575, 116 S.Ct. 1589 (emphasis added). In *State Farm,* the Court unequivocally stated that the

reprehensibility of the defendant's conduct *is* " '[t]he most important indicium of the reasonableness of a punitive damages award....' " *State Farm,* 123 S.Ct. at 1521 (quoting *BMW,* 517 U.S. at 575, 116 S.Ct. 1589). In determining whether a defendant's conduct is reprehensible, the court considers whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

In *BMW,* BMW's conduct was found to be not very reprehensible. Dr. Gore suffered only economic harm; BMW did not show indifference to the health and safety of others; BMW's conduct was not criminal; and although BMW suppressed a material fact, there were no deliberate false statements made. Dr. Gore argued that BMW's conduct was highly reprehensible because it was part of a nationwide pattern of conduct, thereby making BMW a recidivist. *BMW,* 517 U.S. at 577–79, 116 S.Ct. 1589. The Court recognized that a recidivist is usually punished more severely than a first offender, but noted that in some states, BMW's conduct would not have violated state disclosure laws and that BMW had a good faith belief that its conduct would not be considered fraudulent.

---

**60.** Indeed, claims against Exxon were being tried at virtually the same time in both the United States District Court for the District of Alaska and the Superior Court for the State of Alaska.

In *State Farm*, the Court again found the defendant's conduct not very reprehensible, once extra-territorial (non-Utah) factors were set aside. State Farm had altered company records to make Campbell look less culpable, disregarded the overwhelming evidence of liability and almost certainty of an excess judgment at trial, and first assured the Campbells that their personal assets were safe but after judgment told them to put a for-sale sign on their house. The Campbells, like Dr. Gore, argued that State Farm's conduct was reprehensible based on its nationwide business practices. The Supreme Court reiterated that "[a] State cannot punish a defendant for conduct that may have been lawful where it occurred." *State Farm*, 123 S.Ct. at 1522. The Court also emphasized that a defendant should not be punished for out-of-state conduct that is unrelated to the harm suffered by the plaintiffs. *Id.* at 1523. In short, the Court concluded that "[t]he reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20-year period." *Id.* at 1524.

The reprehensibility of a party's conduct, like truth and beauty, is subjective. One's view of the quality of an actor's conduct is the result of complex value judgments. The evaluation of a victim will vary considerably from that of a person not affected by an incident. Courts employ disinterested, unaffected lay jurors in the first instance to appraise the reprehensibility of a defendant's conduct. Here, the jury heard about what Exxon knew, and what its officers did and what they failed to do. Knowing what Exxon knew and did through its officers, the jury concluded that Exxon's conduct was highly reprehensible.

 As part of the constitutional analysis, the court must also determine the reprehensibility of Exxon's conduct, and it does so by applying the factors set forth in *State Farm*. These factors are objective criteria which the court employs to evaluate the jury's subjective appraisal of the quality of a defendant's conduct. With due deference to the jury process, verdicts should not be upset unless the jury result is "grossly excessive" in light of the objective evaluation of a defendant's conduct and therefore, constitutionally impermissible. *BMW*, 517 U.S. at 574, 116 S.Ct. 1589; *State Farm*, 123 S.Ct. at 1519–20.

 In evaluating the reprehensibility of a defendant's conduct, the court may not consider extra-territorial conduct that has no nexus to the harm suffered by plaintiffs. *State Farm*, 123 S.Ct. at 1523. However, the Supreme Court stated in *State Farm* that even "[l]awful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff." *Id.* at 1522. Here, the court views not only the actual grounding of the *Exxon Valdez* as relevant conduct but also Exxon's conduct in the years prior to the grounding that resulted in Exxon giving the keys to a supertanker to a relapsed alcoholic on the evening of March 23, 1989. Exxon's pre-grounding conduct by and large took place outside Alaska. Exxon could have removed Captain Hazelwood from his command on the *Exxon Valdez* based upon knowledge of his relapse into alcoholism. It chose not to do so with tragic consequences. The nexus between the out-of-state conduct of Exxon and the grounding and harm to plaintiffs is clear and convincing.

The court turns now to the *State Farm* reprehensibility factors.

 *Type of Harm.* In determining reprehensibility, the court considers whether

the defendant's conduct caused physical harm or only economic harm to the plaintiffs. In both *BMW* and *State Farm*, the defendants' conduct caused only economic harm. Conduct that results in physical harm is considered more reprehensible than conduct that results in only economic harm. *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir.2001).

Exxon's conduct did not cause only economic harm. The court of appeals has aptly observed on Exxon's earlier appeal that "The huge oil spill obviously caused harm beyond the 'purely economic'". *In re Exxon Valdez*, 270 F.3d at 1242. The social fabric of Prince William Sound and Lower Cook Inlet was torn apart. "[R]esearch on the community impacts of the *Exxon Valdez* Oil Spill clearly delineate a chronic pattern of economic loss, social conflict, cultural disruption and psychological stress."[61] Communities affected by the spill "reported increased incidences of alcohol and drug abuse, domestic violence, mental health problems, and occupation related problems."[62] Also, several studies found that a high percentage of affected fishermen suffered from severe depression, post-traumatic stress disorder, generalized anxiety disorder, or a combination of all three.[63] The spilling of 11 million gallons of crude oil into Prince William Sound and Lower Cook Inlet disrupted the lives (and livelihood) of thousands of claimants and their families for years.

The foregoing shows that the harm that the plaintiffs suffered as a result of Exxon's conduct was much more egregious than the pure economic harm suffered by Dr. Gore whose only harm was that his new car was worth slightly less, or the economic risk and attendant emotional distress to which the Campbells were subject for eighteen months. Moreover, Dr. Gore and the Campbells each chose to deal with their defendant. Here, Exxon unilaterally intruded into the lives of the plaintiffs with no transactional foundation.

*Reckless disregard to the health and safety of others.* Exxon's and Captain Hazelwood's conduct was determined by the jury to have been reckless and its verdict as to liability for punitive damages has already been affirmed. In evaluating the reprehensibility guidepost, the court of appeals observes that the spill "did not kill anyone." *In re Exxon Valdez*, 270 F.3d at 1242–43. That statement is true based upon the record of this case; but we are engaged in a due process inquiry evaluating what Exxon was fairly on notice of prior to the plaintiffs' losses. It is a well-known fact that drunk drivers kill people with alarming frequency.[64] Exxon's decision to leave Captain Hazelwood in command of the *Exxon Valdez* not only

---

**61.** J. Steven Picou, *et al.*, *Community Recovery From the Exxon Valdez Oil Spill: Mitigating Chronic Social Impacts* at 6–7, attached as Exhibit 4 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**62.** Duane A. Gill, *Environmental Disaster and Fishery Co–Management in a Natural Resource Community: Impact of the Exxon Valdez Oil Spill, in Folk Management in the World's Fisheries* 227 (Dyer & McGoodwin, eds., 1994), pertinent part attached as Exhibit 5 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**63.** *See* Plaintiffs' Opposition at 24, n. 20, for a complete list of the relevant studies, Clerk's Docket No. 7501. Pertinent portions of the studies are attached as Exhibits 4 and 6 through 9 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**64.** In 1988, an estimated 23,626 deaths were caused by alcohol-related motor vehicle crashes. *See Traffic Safety Facts 1999* at 32 *available at* http://www–nrd. nhtsa.dot.gov/pfd/nrd–30/ NCSA/TSFAnn/TSF1999/pdf. In 1989, 22,404 alcohol-related fatalities were reported. *Id.*

showed a reckless disregard for the health and safety of those who lived and worked on the Sound, but also recklessly put the captain himself, his crew, and all of his rescuers in harm's way. After its grounding, the *Exxon Valdez* was sitting in a pool of oil. Rescuers had to enter that pool of oil. Careless cigarette smoking, or an electrical failure on the grounded vessel, or so simple and predictable an occurrence as an electro-static discharge when hoses are being connected or disconnected to a vessel might have ignited the crude oil and incinerated everyone in the vicinity.[65]

Finally, Captain Hazelwood, for whom Exxon is responsible, did not just ground the *Exxon Valdez*. Perhaps because of judgment impaired by alcohol, but in the face of knowledge that the vessel had been holed and was rapidly losing crude oil into Prince William Sound, he endeavored to maneuver the vessel. The record reflects that this was a dangerous undertaking, one which might have taken a vessel from a point of more or less stability into a posture where a great deal more oil might have been spilled. Indeed, the vessel might have foundered.

Exxon's conduct showed great disregard for the health and safety of others (including Exxon employees) and appreciably aggravates Exxon's conduct.

*Financially vulnerable targets.* The plaintiffs, plus anyone else who lived and worked on Prince William Sound, were the foreseeable "victims" of Exxon's decision to leave a relapsed alcoholic at the helm of a supertanker carrying a toxic cargo. While the commercial fishermen may not have been financially vulnerable targets, the subsistence fishermen certainly were.[66] Although Exxon's claims program mitigated the impact that its conduct had on financially vulnerable targets, Exxon cannot escape the fact that it knew that it was allowing a relapsed alcoholic to operate a fully-loaded, crude oil tanker in and out of Prince William Sound, a body of water which Exxon knew to be highly valuable for its fishery resources, resources which Exxon knew, or should have known, were relied on by subsistence fishermen.

*Repeated actions or an isolated incident.* BMW and State Farm recognized that a recidivist may be punished more severely than a first-time offender. In the instant case, Exxon's conduct involved repeated actions, not an isolated incident. Granted, Captain Hazelwood only grounded one vessel in Alaska between the spring of 1986 and March of 1989 and there was only one spill of oil from the *Exxon Valdez* into Prince William Sound. But, as the court noted at the outset of its discussion

---

**65.** As an example, Captain William J. Deppe, who took over command of the *Exxon Valdez* after Captain Hazelwood was relieved of his duty, explained that:

> when we were pumping oil from the top like that, oxygen could come in through the openings ... and we would create an explosive atmosphere between the void space, the deck and the oil. By putting the tools and lines and equipment down there, we could get a spark, and if we had an explosive atmosphere, you could blow up the ship.

Transcript of Trial Testimony of William J. Deppe at 7206, lns. 15–20, Excerpts of Record, Vol. I—Trial Transcript, attached to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**66.** A compensatory damages class of Alaska Natives was certified in March of 1994. *See* Order Certifying Commercial Fishing Class, Native Class, and Landowner Class (March 14, 1994), Clerk's Docket No. 4653. The Native class included Alaska Native subsistence fishermen who suffered losses because of the oil spill. An exact number of class members is not available. However, 717 Native subsistence fishermen opted out of the Alaska Natives class. *See* Order No. 307 (granting final approval of settlement between Native opt-out settlement class and Exxon) (Jan. 19, 1996), Clerk's Docket No. 6600.

of the reprehensibility guidepost, the relevant conduct here involves more than just the actual grounding. It involves the conduct that led up to the grounding of the *Exxon Valdez*. March 24, 1989, was not the first time that Exxon had permitted Captain Hazelwood to command a supertanker even though Exxon knew that he had "fallen off the wagon." For approximately three years, Exxon's management knew that Captain Hazelwood had resumed drinking, knew that he was drinking on board their ships, and knew that he was drinking and driving. Over and over again, Exxon did nothing to prevent Captain Hazelwood to sail into and out of Prince William Sound with a full load of crude oil.

*Intentional malice, trickery, or deceit, or mere accident.* The grounding of the *Exxon Valdez* and the consequential spilling of crude oil was not intentional. Captain Hazelwood's purpose just prior to the grounding was to avoid Bligh Reef, not park on it. The defendants' conduct did not involve trickery or deceit. There was no effort on the part of Exxon to hide or minimize what happened.[67] But the grounding was no mere accident.

It is undisputed that Exxon understood and well knew the risks attendant to transporting crude oil out of Valdez, Alaska, and through Prince William Sound. Moreover, Exxon knew that Captain Hazelwood was an alcoholic, it knew that he had resumed drinking, and it knew that Captain Hazelwood was drinking while on duty. Driving under the influence of alcohol is a crime anywhere in the country and in Alaska.[68] Exxon knew from the spring of 1986 that Captain Hazelwood was drinking

and driving the crude oil tanker *Exxon Valdez* and did nothing about it until after the *Exxon Valdez* was grounded.

■ The court of appeals observed in this regard that Exxon's knowledge "goes more to justify punitive damages than to justify punitive damages at so high a level." *In re Exxon Valdez*, 270 F.3d at 1242. Certainly Exxon's knowledge that Captain Hazelwood was drinking and driving the *Exxon Valdez* is an important, perhaps the most important, reason why the jury found and the court of appeals affirmed Exxon's liability for punitive damages. But, Exxon's knowledge is also a fundamental component of fair notice. Fair notice is the foundation of due process under the Fourteenth Amendment. Respectfully, the extent of Exxon's knowledge should also be a consideration in the characterization of the quality of Exxon's conduct.

Here we are concerned about due process and what Exxon should reasonably have anticipated as punishment for wrongful conduct. There is a direct nexus between what Exxon should reasonably have expected as punishment and the extent of its knowledge of Captain Hazelwood's situation. It is one thing to knowingly employ a sober recovering alcoholic. It is quite another—a far more serious matter—to have knowingly and intentionally allowed Captain Hazelwood to continue as master of the *Exxon Valdez* despite his relapse. Some Exxon representatives contended that Captain Hazelwood was the most watched person in the fleet, and he may have been. Exxon officials nevertheless ignored the information that was at their disposal, leaving Captain Hazelwood to op-

---

**67.** Hiding a 900–foot vessel capable of carrying more than 53 million gallons of crude oil—even in so large a body of water as Prince William Sound—would not have been possible. More to the point, however, Exxon not only made no effort to hide what happened but, rather, Captain Hazelwood

reported the incident to the Coast Guard immediately. *See also supra* note 13 and accompanying text.

**68.** AS 28.35.030(a) and (r)(3) as regards operating watercraft.

erate a huge tank vessel through Prince William Sound, a body of water known for its valuable fishing resources. This is not someone hauling dry cargo, the spilling of which would have minimal impact on the fisheries and other uses of Prince William Sound. Rather, this is an employer deliberately permitting a relapsed alcoholic to continue operating a vessel carrying over 53 million gallons of volatile, toxic, crude oil. In the view of this court, the decision by Exxon to leave Captain Hazelwood in command of the *Exxon Valdez* is *the* critical factor in evaluating the quality of Exxon's conduct and therefore the amount of punitive damages.

Exxon willfully[69] allowed Captain Hazelwood to continue to operate a supertanker filled with crude oil despite Exxon's knowledge that he was drinking again. It was this intentional decision by Exxon that led to the plaintiffs being harmed. Willfulness—ignoring reason—is a principal component of malice.[70] Exxon's management of Captain Hazelwood amounted to intentional malice toward the plaintiffs.

■ *Conclusion as to Reprehensibility*. Punitive damages " 'should reflect the enormity of [the defendant's] offense. . . .' " *In re Exxon Valdez*, 270 F.3d at 1241 (quoting *BMW*, 517 U.S. at 575, 116 S.Ct. 1589). Exxon's conduct did not simply cause economic harm to the plaintiffs. Exxon's decision to leave Captain Hazelwood in command of the *Exxon Valdez* demonstrated reckless disregard for a broad range of legitimate Alaska concerns: the livelihood, health, and safety of the residents of Prince William Sound, the crew of the *Exxon Valdez*, and others. Exxon's conduct targeted some financially vulnerable individuals, namely subsistence fishermen. Plaintiffs' harm was not the result of an isolated incident but was the result of Exxon's repeated decisions, over a period of approximately three years, to allow Captain Hazelwood to remain in command despite Exxon's knowledge that he was drinking and driving again. Exxon's bad conduct as to Captain Hazelwood and his operation of the *Exxon Valdez* was intentionally malicious.

Comparing Exxon's conduct with what happened in *BMW* and *State Farm*, Exxon's conduct was many degrees of magnitude more egregious. For approximately three years, Exxon management, with knowledge that Captain Hazelwood had fallen off the wagon, willfully permitted him to operate a fully-loaded, crude oil tanker in and out of Prince William Sound—a body of water which Exxon knew to be highly valuable for its fisheries resources. Exxon's argument that its conduct in permitting a relapsed alcoholic to operate an oil tanker should be characterized as less reprehensible than what State Farm did to the Campbells suggests that Exxon, even today, has not come to grips with the opprobrium which society rightly attaches to drunk driving. While there are surely other situations that would be more reprehensible—such as knowingly allowing a relapsed alcoholic to operate a 747 aircraft loaded with passengers—this case is in an entirely different galaxy than selling repainted cars as new, passing off a product as that of a competitor's, or refusing for eighteen months to pay an excess judgment of $185, 849. Based on the foregoing, the court finds Exxon's conduct highly reprehensible.

---

**69.** Willful is defined as: "governed by will without yielding to reason or without regard to reason" or "done deliberately." *Webster's Third New International Dictionary* 2617 (1981).

**70.** Malice is defined as: "intention or desire to harm another usu[ally] seriously through doing something unlawful or otherwise unjustified," "*willfulness in commission of a wrong*," or "evil intention." *Id.* at 1367 (emphasis supplied).

*Ratio.* The ratio guidepost requires the court to compare "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award[.]" *State Farm,* 123 S.Ct. at 1520. The harm side of the ratio is made up of two components: actual harm to the victim and the harm that was likely to occur. *BMW,* 517 U.S. at 581, 116 S.Ct. 1589. The trial jury in this case was expressly instructed to consider the magnitude of "actual" and "likely" harm.[71] Under this guidepost, the court may also consider whether the compensatory damages award contained a punitive component, whether the economic injuries were minor, and whether the plaintiffs suffered physical harm or trauma. *State Farm,* 123 S.Ct. at 1524–25.

The Supreme Court has repeatedly declined "to impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 1524. However, the Court has also repeatedly noted that "traditional" multipliers for wrongful conduct have been in the range of double, treble, or quadruple damages and that a ratio of more than 4–to–1 might be "close to the line of constitutional impropriety." *Id.* (citing *Haslip,* 499 U.S. at 23–24, 111 S.Ct. 1032). "Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Id.* (quoting *BMW,* 517 U.S. at 582, 116 S.Ct. 1589). "A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *BMW,* 517 U.S. at 582, 116 S.Ct. 1589. But, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory dam-

ages, can reach the outermost limit of the due process guarantee." *State Farm,* 123 S.Ct. at 1524. "The precise award in any case, of course, must be based upon facts and circumstances of the defendant's conduct and the harm to plaintiff." *Id.*

In *BMW,* the actual and potential harm to Dr. Gore was limited to $4,000. Thus, the Court stated that the 500–to–1 ratio between punitive damages and the harm suffered by Dr. Gore "must surely 'raise a suspicious judicial eyebrow.'" *BMW,* 517 U.S. at 583, 116 S.Ct. 1589 (quoting *TXO,* 509 U.S. at 481, 113 S.Ct. 2711 (O'Connor, J., dissenting)). In *State Farm,* the Court began its application of the ratio guidepost with the presumption that a triple-digit ratio would not comport with due process, but plainly, the appropriate ratio is still "somewhat indeterminate." *In re Exxon Valdez,* 270 F.3d at 1243.

Not only is the ratio somewhat indeterminate, but "potential harm" is often not subject to precise calculation. *TXO,* 509 U.S. at 460, 113 S.Ct. 2711. In *TXO,* the United States Supreme Court observed that "[i]t is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *Id.* (emphasis in original). While neither *BMW* or *State Farm* involved potential harm, both cases acknowledged that potential harm is part of the ratio analysis. Clearly this court is not restricted to the jury's compensatory award in evaluating the ratio guidepost. Moreover, in another case flowing from the grounding of the *Exxon Valdez* (*Sea Hawk Seafoods, Inc. v. Exxon Corp.,* 246 F.3d 676 (Table) (2000 WL 1860726) (9th

**71.** Jury Instruction No. 27, Clerk's Docket No. 5890.

Cir.2000)), the Ninth Circuit Court held that Western Alaska Fisheries, Inc., a seafood processor that did not file an independent lawsuit against Exxon, could nevertheless share in the class action punitive damages award on the same basis as other, eligible, seafood processors. The court of appeals stated that "[u]nder federal law, including federal maritime law, punitive damages are available to any person or entity that suffered actual injury arising from a defendant's violation of a federally protected right, independent of whether legal injury is established at trial." *Id.* at *2. If this be true, then it may also follow that claimants who were dismissed from this case and were not awarded any compensatory damages could also share in the punitive damages award if they suffered some actual injury that involved a federally protected right. In addition, there are plaintiffs whose claims, dismissed by this court, have been reinstated by the court of appeals and have not yet been settled. *See In re Exxon Valdez*, 270 F.3d at 1253.[72] These claimants have "potential" for adding to the harm side of the ratio.

As to actual harm—the compensatory damages associated with the grounding of the *Exxon Valdez*—the parties differ sharply. Exxon first contends that the actual harm number for purposes of ratio calculation can be no higher than $20.3 million, which is the amount of the two compensatory judgments ultimately entered against Exxon. Exxon contends that all other payments it made were prejudgment payments or settlements, which the court of appeals has said do not count for purposes of calculating actual harm.[73] If pre-judgment payments or settlements do not reduce actual harm, Exxon contends that the actual harm number is $383 million.[74] The plaintiffs contend that the actual harm component of total compensatory damages is $513.1 million.[75] This number is based on actual judgments and recoveries obtained by distinct categories of plaintiffs from Exxon and the TAPL Fund.[76]

The court finds that the best indicators of actual, compensatory damages in this case are the following items:

(1) $287,000,000 Phase II jury verdict[77]

(2) $9,515,000 paid by Exxon to Native corporation owned seafood processing operations[78]

72. Specifically, the claims of tender boat operators and crews, cannery workers, and 34 seafood processors were reinstated. Some of these reinstated claims have been settled; some are still pending.

73. Exxon also argues that most of its prejudgment payments could not reasonably be treated as compensation for actual harm caused by the oil spill because Exxon's prompt payment of claims protected the plaintiffs from economic loss that might have otherwise occurred. Whether Exxon's prejudgment payments represent "actual" harm or harm that might otherwise have occurred is ultimately irrelevant since the court must consider both harms for purposes of calculating a ratio. *BMW*, 517 U.S. at 581, 116 S.Ct. 1589.

74. Exxon's Second Renewed Motion for Reduction or Remittitur of Punitive Damages Award at 24, Clerk's Docket No. 7753.

75. Plaintiffs' Memorandum in Opposition to Exxon's Second Renewed Motion for Reduction or Remittitur of Punitive Damages Award at 21, Clerk's Docket No 7767.

76. *See* chart summarizing judgments and recoveries at page 39 of Plaintiffs' Opposition, Clerk's Docket No. 7501.

77. The precise amount the jury awarded was $286, 787, 739.22. *See* Minutes from the United States District Court (Aug. 11, 1994), Clerk's Docket No. 5716.

78. Amended Stipulation Regarding Impacts for Phase III at 5, Part III, ¶ 5, Clerk's Docket No. 5634.

(3) $113,500,000 paid to other commercial fish processors [79]

(4) $6,000,000 paid to the Seattle Seven fish processors [80]

(5) $4,000,000 paid to fish processors by TAPL Fund [81]

(6) $20,000,000 paid by Exxon to members of the Native class [82]

(7) $2,600,000 paid by Exxon to Native class members who opted out [83]

(8) $17,790,510 net paid to Native corporations by TAPL Fund (after reimbursement by corporations to the Fund; Native corporations reimbursed the Fund $7.4 million) [84]

(9) $3,254,576 paid by Exxon to Native corporations [85]

(10) $152,275 Tatitlek state court jury verdict [86]

(11) $592,500 in other settlements to Native corporations [87]

(12) $8,521,667 paid by Exxon to municipalities and villages [88]

(13) $974,000 in additional settlements to municipalities and villages [89]

(14) $724,000 state jury verdict for Kodiak Island Borough [90]

(15) $1,340,178 paid by TAPL Fund to municipalities and villages [91]

(16) $1,500,000 received by municipalities and villages as part of the State of Alaska's recovery against Alyeska [92]

(17) $13,400,000 Phase IV settlement [93]

(18) $4,071,694 paid by TAPL Fund to cannery workers, tenders, and seafood brokers [94]

**79.** *Id.* at ¶ 6.

**80.** 1996 Settlement Agreement at 4, Part II, ¶ A, Exhibit 16 to Oesting Declaration which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**81.** *See* Exhibit C to Declaration of John F. Daum, which is appended to Defendants' Reply, Clerk's Docket No. 7535.

**82.** Amended Stipulation Regarding Impacts for Phase III at 2, Part I, ¶ 1, Clerk's Docket No. 5634.

**83.** *See* Order No. 307 (Jan. 19, 1996), Clerk's Docket No. 6600.

**84.** *See* Daum Declaration at 3, ¶ 6, which is appended to Notice of Filing Original Declaration, Clerk's Docket No. 7540, and Exhibit C to his declaration, which is attached to Defendants' Reply, Clerk's Docket No. 7535. *See also*, Oesting Declaration at 7, ¶ 13, and 10, ¶ 15, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**85.** *See* Memorandum from W. Monte Taylor at 53 (Mar. 20, 1992), attached as Exhibit 19 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**86.** Oesting Declaration at 9, ¶ 14, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**87.** *See* Exhibits 21 and 22 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**88.** *See* Taylor Memorandum at 53, attached as Exhibit 19 to Oesting Declaration, and Exhibit 24 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**89.** *See* Exhibits 25, 26, and 27 attached to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**90.** *See* Exhibit 28 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**91.** *See* Oesting Declaration at 8, ¶ 13, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501. This number should probably be slightly lower as it likely includes interest.

**92.** *See id.* at 11, ¶ 16.

**93.** *See id.* at 12, ¶ 17.

**94.** *See id.* at 13, ¶ 18. This number probably includes interest and so should be slightly lower.

(19) $11,964,793 paid by Exxon to cannery workers, tenders, and seafood brokers [95]

(20) $388,596 paid by Exxon to area businesses [96]

(21) $219,305 paid by TAPL Fund to area businesses [97]

(22) $821,000 paid by Exxon to reinstated seafood processors [98]

(23) $3,067,646 paid by Exxon to reinstated cannery workers [99]

(24) $1,750,000 paid by Exxon to reinstated tenderboat operators and crew. [100]

These figures represent a total actual harm of $513,147,740.

Laying aside briefly the question of whether it is possible to place a number on the likely or potential harm flowing from the grounding of the *Exxon Valdez*, this court turns now to what it has found to be the most troubling aspect of the decision of the court of appeals in *In re Exxon Valdez*. Without citation of authority, and without explanation that has a nexus to the due process fair notice issue which underlies the question of whether or not punitive damages are grossly excessive, the court of appeals observed with respect to the ratio analysis that:

> The amount that a defendant voluntarily pays before judgment should generally not be used as part of the numerator, because that would deter settlements prior to judgment.

*In re Exxon Valdez*, 270 F.3d at 1244.[101]

The briefing of the parties and the court's independent research suggest that authority on the issue under consideration is virtually nonexistent, and what sparse authority there is reaches a contrary conclusion. In *Kelley v. Michaels*, 59 F.3d 1050 (10th Cir.1995), the court dealt with an actual damage award of $292,750 and a punitive damages award of $500,000. However, the net actual damages recovered by the plaintiff were only $2,750 because of an offset of $290,000 which was the result of a partial settlement of the plaintiff's claim. The Tenth Circuit employed the $292,750 compensatory award in calculating the ratio of harm to punitive damages. *Id.* at 1055. A similar result is to be found in *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219 (10th Cir.2000), where the district court reduced a compensatory award made by a jury but did not reduce the punitive award. There, also, the Tenth Circuit rejected the argument that because the district court reduced the compensatory award to prevent a double recovery to the plaintiff, the punitive award should also be reduced. *Id.* at 1231 n. 6. Thus, in determining harm for

---

95. *See id.*

96. *See* Exhibit 30 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

97. Oesting Declaration at 13, ¶ 19, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

98. Exxon's Second Renewed Motion for Reduction or Remittitur of Punitive Damages Award at 23 n. 27, Clerk's Docket No. 7753.

99. *Id.*

100. *Id.*

101. Following the suggestion that the court should generally discount compensatory damages by the amount of voluntary payments or settlements, the court of appeals goes on (as a part of its discussion of the ratio) to speak of cleanup expenses, observing that they "should be considered as part of the deterrent already imposed." *In re Exxon Valdez*, 270 F.3d at 1244. But cleanup costs have to do with environmental damage, and the jury was precluded from considering that harm in making its award of punitive damages. In this case, environmental harm and deterrence of it should stand apart from other harms and the punishment and deterrence of them.

the second *BMW* guidepost (the ratio), the Tenth Circuit added back into the compensatory award those damages that had been subtracted out because of a double recovery. *Id.* at 1231.

As already noted, the court of appeals' reason for suggesting the subtraction of voluntary payments was because to do otherwise would deter settlements prior to judgment. This court does not understand how or why encouraging settlements should be a part of the due process analysis of a punitive damages award made in a case which went to trial. Moreover, this court believes that a contrary view is more logical. If a defendant knows that it will get credit in the computation of punitive damages for a partial settlement, voluntarily made before trial, it may be encouraged to go to trial; whereas, as a general proposition the specter of a large punitive damages award is a very powerful factor in encouraging settlements of entire cases. Reducing the risk of going to trial on punitive damages by discounting them for voluntary payments does not encourage settlements; it encourages trials.

⎯ ▇ In this case, if the general rule announced by the circuit—that the harm factor should be reduced by voluntary payments—is held to be the law, then that general rule should not apply in this case. This position is not taken because of this court's view of how reducing harm for purposes of punitive damages evaluation might impact the settlement process, but because of the specific punitive damages instructions given the jury in this case.

Generally, punitive damages instructions are very open–ended as regards how juries should come up with a punitive damages number if liability for such damages is

determined. For example, the Ninth Circuit Model Civil Jury Instruction for punitive damages provides as to the amount of punitive damages only that:

> If you find that punitive damages are appropriate, you must use reason in setting the amount. Punitive damages, if any, should be in an amount sufficient to fulfill their purposes but should not reflect bias, prejudice or sympathy toward any party. In considering punitive damages, you may consider the degree of reprehensibility of the defendant's conduct and the relationship of any award of punitive damages to any actual harm inflicted on the plaintiff.[102]

In instructing the jury in this case, and as set out fully in marginal notes above, the court, with much assistance from the parties, went far beyond the norm in endeavoring to give the jury guidance on how to determine punitive damages. In those instructions, the jury was specifically admonished to take account of mitigating factors. It was instructed that it could "consider whether a defendant has made payments for compensatory damages, settlements, and incurred other costs and expenses of remedial measures." [103]

In arguing this case to the jury, the plaintiffs sought punitive damages of more than $5 billion and less than $20 billion.[104] The jury plainly did not buy plaintiffs' top-dollar analysis of how punitive damages should be calculated in this case. The court presumes that the jurors followed and faithfully applied, to the best of their ability, the court's instructions. *See Leatherman*, 285 F.3d at 1150 ("we must presume the jury understood and followed the instructions"). Presumably the jury

---

**102.** Ninth Circuit Model Civil Jury Instruction No. 7.5.

**103.** Jury Instruction No. 36, Clerk's Docket No. 5890.

**104.** *See* Transcript of Proceedings, Trial by Jury—70th Day, at 7587, lns. 23–25 (Aug. 29, 1994), Clerk's Docket No. 5778.

already considered whether and to what extent punitive damages should be mitigated based on voluntary payments by Exxon before judgment. Reducing actual harm for purposes of ratio analysis by the amount of voluntary payments unfairly skews the ratio in Exxon's favor, and in effect gives Exxon double credit for voluntary payments by reducing both punitive damages which were based on mitigation instructions and actual harm for purposes of the punitive damages/harm ratio analysis. In this case, the court concludes that it should not discount actual harm by voluntary payments made by Exxon.

Thus, the court finds that the actual harm Exxon's conduct caused plaintiffs was $513,147,740. The punitive damages award was $5 billion, which leads to a ratio of 9.74-to-1. This ratio, of course, does not include any consideration of potential harm, a consideration that is still appropriate after *State Farm.*

In this case, there was purely non-economic harm that cannot be quantified; there was harm which likely occurred but has not yet been valued; and there was potential harm—all flowing from the grounding of the *Exxon Valdez.*

Firstly, there are some 32,677 punitive damages claimants.[105] These claimants did not get deceived about the quality of the paint on a new car. As discussed in detail above, the most direct and palpable effect of Exxon's recklessness was upon the livelihood of Prince William Sound, Cook Inlet, and Kodiak area fishermen. However, the spilling of 11 million gallons of crude oil into Prince William Sound and Lower Cook Inlet also disrupted the lives of thousands of claimants and their families. The trauma was real although not physical. That harm cannot be quantified.

Secondly, there are plaintiffs whose claims have been reinstated in *In re Exxon Valdez* and whose claims are not yet determined. Putting a number on these claims would be speculative, even though the harm is very likely to have occurred.

Thirdly, and in the area of potential harm, there is no way of calculating how much additional oil might have spilled into Prince William Sound and spread elsewhere had Captain Hazelwood's efforts to back the *Exxon Valdez* off Bligh Reef succeeded. Here, the risk of more extensive economic and non-economic losses to the plaintiffs is immense and incalculable. If more oil would have been spilled, it is very likely that the oil would have spread further so as to affect more fisheries and more fishermen than the thousands who are plaintiffs in this case. Had the entire cargo spilled, the risk to the *Exxon Valdez* crew and its rescuers would have also been enhanced. Exxon insists that *State Farm* precludes any consideration of potential harm to anyone besides the plaintiffs. While it is the court's view that consideration of the risks to rescuers and crew does not run afoul of *State Farm* or other constitutional concepts, even if this potential harm is excluded, the additional harm to the plaintiffs had the entire cargo spilled would have been immense. For Exxon to suggest that spilling the entire tanker load of crude oil into Prince William Sound involved no more risk or no more

---

105. *See* Plaintiffs' Response to Court's Requests at Oral Argument at 4, Clerk's Docket No. 7553. This number includes claimants whose claims are based on recreational uses or commercial fishing activities in unoiled commercial fisheries. These claimants may be entitled to punitive damages under the Ninth Circuit's holding in *Sea Hawk Foods,* 246 F.3d 676 (Table) (2000 WL 1860726). *But see* Exxon's Memorandum with Respect to Plaintiffs' Response to Court's Questions, Clerk's Docket No. 7561.

Here, the court discusses potential harm, so use of the number of claimants potentially entitled to receive punitive damages seems most appropriate.

potential loss to anyone than spilling a fifth of its cargo is ludicrous. It is true that having once closed fishing for a full season, the season cannot be closed again, but that says nothing about whether additional fisheries or fishing seasons could have also been lost.

Because there is no way to quantify the non-economic, potential, and yet-to-be-litigated economic harms discussed above, the appropriate approach is to accommodate the unknowns by allowing a higher ratio to pass constitutional muster. This is in keeping with Supreme Court precedent. In *BMW*, the Court observed that "[a] higher ratio may ... be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *BMW*, 517 U.S. at 582, 116 S.Ct. 1589.

Besides unquantified harm, there are other factors that support a higher ratio in this case. In *State Farm*, the Court observed that a higher ratio may be appropriate when the defendant's conduct is highly reprehensible and the economic damages recovered by the plaintiffs are small. *State Farm*, 123 S.Ct. at 1524. Exxon insists that the economic damages in this case were "substantial" and thus a 1–to–1 ratio is all that is appropriate. In *State Farm*, the Court found the $1 million in compensatory damages awarded to the Campbells "substantial" and suggested that a lower ratio, in the realm of 1–to–1, would be appropriate in that case. In *State Farm*, there were two plaintiffs. Assuming that each plaintiff was entitled to an equal share of the damages, each plaintiff received $500,000 in compensatory damages, a substantial number under any circumstances. Here, there are 32,677 claimants. Using the $513,147,740 as the measure of damages and assuming that each plaintiff was entitled to an equal share (which the court is aware is not the case), the plaintiffs' average share of the

total recovery is $15,704. That is a far cry from the half-million dollars each plaintiff in *State Farm* received. The court is unpersuaded that the damages in this case were "substantial". Rather, this is a case in which the economic damages recovered by the average plaintiff was relatively small.

In *State Farm*, the Court indicated that where compensatory damages already contain a punitive component, a lower ratio may be appropriate. In *State Farm*, the compensatory damages awarded to the Campbells contained such a punitive component. *State Farm*, 123 S.Ct. at 1525. The same is not true here. The compensatory damages that the plaintiffs received were solely for economic losses and had no punitive component. Unlike the Campbells, who pursued an intentional infliction of emotional distress claim against State Farm, the plaintiffs here never pursued such claims against Exxon. Therefore, unlike the Campbells who were compensated for the emotional distress that State Farm caused, the plaintiffs here have never been compensated for the emotional distress (the disruption of their lives discussed earlier) that resulted from oil spill which was caused by Exxon's reckless behavior. Because the plaintiffs' compensatory damages did not already contain a punitive component, a higher, single-digit ratio is appropriate in this case.

The court of appeals suggests that the cleanup costs and the like paid by Exxon would go a long way toward effecting appropriate deterrence. *In re Exxon Valdez*, 270 F.3d at 1244. As discussed above, this court is of the view that we are far past the question of whether the cleanup costs incurred by Exxon was sufficient deterrence in and of itself. That was the dealt with in the environmental litigation as discussed above. However, the issue of over-deterrence is relevant to the constitu-

tional analysis because over-deterrence may mean that a defendant did not have fair notice that its actions could subject it to the level of punishment and deterrence imposed.

Apparently taking a cue from Justice Breyer's concurrence in *BMW*,[106] the court of appeals discusses how entrepreneurs do their planning, suggesting that they are deterred by the prospect of cleanup costs and the like. The appeals court concludes by observing, "[a]s bad as the oil spill is, fuel for the United States at moderate expense has great social value and that value as well as the value of avoiding horrendous oil spills can be reconciled by ratio analysis." *Id.*

While the court of appeals' economic analysis makes sense in the abstract or academic world, its analysis reflects what well-informed, rational entrepreneurs would do. In the real world, Exxon and its officials and managers do not work this way. If they did, they would remove the Captain Hazelwoods from the bridge because leaving them there is what creates a risk of horrendous cleanup costs and other expenses. Thus, what it theoretically takes to deter a rational business person (cleanup costs, etc.), and what it takes to deter corporate officials given to reckless conduct are very different. Here, we are dealing with reckless corporate officials.

The following considerations cause this court to believe that a higher, single-digit ratio presents no identified risk of over-deterrence. Firstly, a huge number of claimants suffered harm that was not purely economic. The harm struck at their lifestyle, causing trauma but no prov-

en physical injuries. The health and safety of the residents of the Sound, people working on the Sound, the *Exxon Valdez* crew, and their rescuers were put at risk.

Secondly, the court is aware of no evidence in the record of this case suggesting that Exxon is able to pass its cleanup and other costs associated with the *Exxon Valdez* spill on to the public. Thus there is no showing that the deterrent effect of Exxon's costs (or the punitive sanctions) threatened the socially valuable availability of moderately priced fuel.[107]

Thirdly, the discussion thus far has said nothing about the financial circumstances of the defendants. In *State Farm*, the Court stated that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 123 S.Ct. at 1525. However, the Court also observed that it was neither unlawful nor inappropriate to consider the defendant's wealth. *Id.* Punitive damages are intended to punish and deter; they are not intended to be an economic death sentence. Here, after judgment was entered on the punitive damages award, Exxon's treasurer advised the court that "the full payment of the Judgment would not have a material impact on the corporation or its credit quality."[108] In fact, Exxon was able to protect itself from the risk of the plaintiffs executing on the $5 billion judgment by posting an irrevocable, syndicated standby letter of credit for over $6 billion.[109] There is absolutely no chance of a $5 billion punitive damages award amounting to an economic death sentence for Exxon. This is at least some evidence of the

---

106. *BMW*, 517 U.S. at 593, 116 S.Ct. 1589 (Breyer, J., concurring).

107. As already observed, cleanup costs have to do with environmental damage; and in this case, environmental damages have been excluded from the punitive damages determination and this court's ratio analysis.

108. Declaration of Edgar A. Robinson at 16, ¶ 30, pertinent portion attached as Exhibit 33 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

109. *See* Clerk's Docket No. 6914.

absence of over-deterrence. In any event, this is *not* a case where Exxon's size and wealth has been used by the plaintiffs as a surrogate for the " 'failure of other factors, such as "reprehensibility." ' " *State Farm,* 123 S.Ct. at 1525 (quoting *BMW,* 517 U.S. at 591, 116 S.Ct. 1589 (Breyer, J., concurring)).

■ The foregoing discussion of deterrence says nothing about the coequal goal of punitive damages: punishment. The deterrence aspect of punitive damages is intended to be essentially forward-looking. The goal is to modify the future conduct of Exxon and others similarly situated. The punishment aspect of punitive damages awards is backward-looking. The law imposes sanctions for reckless conduct of the past. The concepts are therefore quite different and foster different societal goals.

The harms visited upon the plaintiffs and punitive damages class members (both actual and potential harm) are, for reasons discussed above, not entirely economic, and Exxon's conduct was highly reprehensible. Thus, the applicable ratio of punitive damages to harm must be such as to accommodate not just the deterrence of reckless conduct in the future, but also punishment for the recklessness which gave rise to the harm.

■ "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution[.]" *State Farm,* 123 S.Ct. at 1524. The court concludes that the dual purposes of punitive damages and the circumstances of this case justify a 9.74–to–1 punitive damages to actual harm ratio. The reprehensibility of Exxon's conduct, the low per-plaintiff average economic damages recovered, the actual and potential unquantified harm, and the lack of a punitive component in the compensatory damages all point to a higher ratio in this case. Considering all of the foregoing,

the court is persuaded that a punitive damages award of $5 billion was "both reasonable and proportionate to the amount of harm to the plaintiff[s] and to the general damages recovered." *Id.* That award was not grossly excessive in comparison to the actual and potential harm occasioned by the grounding of the *Exxon Valdez.*

*Comparable Penalties.* In *BMW,* the Court announced that "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *BMW,* 517 U.S. at 583, 116 S.Ct. 1589. Although indicating that both civil and criminal penalties were appropriate for comparison, the *BMW* Court only looked to the comparable civil penalty, which was $10,000. The Court observed that the $2 million punitive damages award was "substantially greater" than the statutory fine of $10,000. *BMW,* 517 U.S. at 584, 116 S.Ct. 1589.

In *State Farm,* the Court dropped any reference to criminal penalties, stating that "[t]he third guidepost in [*BMW* ] is the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.' " *State Farm,* 123 S.Ct. at 1526 (quoting *BMW,* 517 U.S. at 575, 116 S.Ct. 1589). The *State Farm* Court acknowledged that in past cases it had looked to comparable criminal penalties that might be imposed. The Court then observed that

> [t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility.

*Id.* The Court emphasized that "[p]unitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." *Id.* The Court then only looked at the compa-

rable civil penalty to which State Farm could have been subject, which again was $10,000. The Court observed that the civil fine was "dwarfed by the $145 million punitive damages award." *Id.*

Thus, after *State Farm*, there has been some discussion as to whether comparable criminal penalties are still appropriate for consideration under the third guidepost. This court's role is to make a due process inquiry. The potential size of criminal sanctions not only tells us that Alaska (and Federal) authorities view oil spills as very serious, but the criminal (and civil) sanctions available are a useful double-check of what Exxon reasonably would have understood was the outside limit of punishment that it could incur by reckless conduct. The latter is the focus of the constitutional inquiry.

In criminal proceedings brought against them by the federal government, the Exxon defendants were charged with five separate counts. Count I charged a violation of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(1); Count II, a violation of the Refuse Act, 33 U.S.C. §§ 407 and 411; Count III, a violation of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a); Count IV, a violation of the Ports and Waterways Safety Act, 33 U.S.C. § 1232(b)(1); and Count V, a violation of the Dangerous Cargo Act, 46 U.S.C. § 3718(b).[110] Exxon Corporation

pled guilty to Count III, and Exxon Shipping pled guilty to Counts I, II, and III, and both were fined.[111] That said, the point to be made here is that Exxon has admitted criminal responsibility for its conduct. It is plainly, therefore, not unreasonable to evaluate the constitutionality of a civil award of punitive damages in the light of what Exxon could have reasonably been on notice of had it considered the civil and criminal sanctions which could flow from the conduct in question. The actual criminal penalty imposed is not the proper criteria for the constitutional inquiry in which we are engaged. Our focus is the outer limit of potential sanctions that Exxon was charged with knowing prior to the grounding of the *Exxon Valdez.*

For each of the five criminal offenses brought against it, the Exxon defendants might have been fined "twice the gross [pecuniary] loss" occasioned by the oil spill. 18 U.S.C. § 3571(d). Laying aside harm likely caused by the oil spill which has not been quantified, and laying aside harm that might potentially have been occasioned by the spill had Captain Hazelwood succeeded in backing the *Exxon Valdez* off Bligh Reef, the court has found the actual pecuniary loss for purposes of the constitutional analysis to be $513.1 million. That amount doubled, as provided by the statute, and multiplied by five offenses equals $5.1 billion.[112] Because Exxon is on

**110.** *See United States v. Exxon Corp.,* No. A90–0015–CR.

**111.** Pursuant to a joint plea agreement, Exxon was fined a net amount of $25 million and ordered to pay restitution in the amount of $100 million. *See* Judgments at Clerk's Docket Nos. 235 and 236 in Case No. A90–0015–CR. The net amount of the fine was affected by at least three considerations: (1) the plea agreement effected a settlement which avoided a difficult and expensive trial, (2) at the time of the disposition of the criminal case, this court did not have the benefit of the more robust development of actual damages which took place later in the civil proceedings, and

(3) there were practical reasons why the court eschewed a larger fine in favor of a substantial restitution obligation. The court deemed it far preferable for Exxon to be sanctioned by means of a restitution obligation which would be employed for restoration of the environment than by a larger fine which would not be so employed.

**112.** Exxon suggests that voluntary pre-judgment payments should be deducted when calculating a potential fine, just as those payments should be deducted when calculating the ratio under the second *BMW* factor. In this case, a reduction would be no more ap-

notice of the provisions of the criminal laws of the United States, in particular 18 U.S.C. § 3571(d), it was, for constitutional due process purposes, on notice that criminal sanctions for spilling even a modest portion of the cargo of the *Exxon Valdez* could lead to truly horrendous criminal penalties. Perhaps more important because we are concerned about notice of what *could be,* Exxon is fairly chargeable with knowledge that reckless conduct on its part could result in the spill of the entire cargo of a tank vessel such as the *Exxon Valdez.* While the court is not prepared to say that spilling the entire cargo of the *Exxon Valdez* would cause additional damage in direct proportion to that actually observed, spilling five times as much oil as was spilled would surely result in a significant increase in Exxon's exposure for criminal and civil penalties. Surely Exxon knew that billions of dollars were at stake if it were to criminally spill a tanker-load of oil in Prince William Sound. Plainly those fines could exceed the jury's punitive damages award in this civil case.

Subsection 3551 of Title 18, United States Code, also provides for imprisonment.[113] While it is not possible to imprison a corporate defendant in a criminal case, provision for imprisonment is a recognized legislative signal of heightened seriousness of the offense, and therefore, for purposes of the constitutional analysis, justifies a punitive damages award " 'much in excess of the fine that could be imposed[.]' " *BMW*, 517 U.S. at 583, 116 S.Ct. 1589 (quoting *Haslip*, 499 U.S. at 23, 111 S.Ct. 1032).

The Ninth Circuit Court of Appeals observed that "[c]eilings on civil liability are also instructive." *In re Exxon Valdez*, 270 F.3d at 1245. The court of appeals discussed the $100 million "cap" on liability for discharging oil from a vessel as provided by the Trans–Alaska Pipeline Act. 43 U.S.C. § 1653(c)(1) & (3). This limit upon liability is not in any sense a sanction, nor is it a limit on civil liability. It is, rather, an upper limit of *strict* liability for harms caused by non-negligent spilling of oil. Here, we deal with Exxon's reckless conduct and focus upon sanctions as to which the statutory limit of strict liability for non-negligent conduct is not instructive.

In *BMW*, the Court suggests that a more appropriate consideration is exposure to civil penalties for wrongful conduct. *BMW*, 517 U.S. at 584, 116 S.Ct. 1589. Both state and federal law make provision for the imposition of civil penalties for spilling crude oil into Prince William Sound. Alaska Statutes, Section 46.03.758, imposes civil penalties ranging from $1 per gallon to $10 per gallon, depending on where the oil is spilled. The plaintiffs estimate that state civil penalties for spilling 11 million gallons of oil in Prince William Sound would amount to $63.8 million, or an average of $5.80 per gallon.[114] Federal civil penalties of $270,000 could also have been imposed for the spill. *See* 16 U.S.C. §§ 668(b), 1858(a); 33 U.S.C. §§ 1232(a)(1), 1319(g), 1514(b)(3), 1908(b); 43 U.S.C. § 1350(b); and 46 U.S.C. § 3718(a)(1). Again, the foregoing presupposes the actual spill, whereas Exxon was fairly on notice that reckless conduct

propriate here than it was for purposes of calculating the ratio.

**113.** Exxon personnel with the authority and responsibility for placing a relapsed alcoholic in control of a large tank vessel might be imprisoned for up to one year. 33 U.S.C. §§ 407 and 411.

**114.** Plaintiffs' Opposition at 70, Clerk's Docket No. 7501. Exxon could have received an offset equal to the amount of oil it removed from the environment as part of cleanup efforts. *See* AS 46.03.758(f).

could cause the loss of the entire cargo thereby putting it at risk for state civil penalties approaching five times the civil penalty which would attend the actual spill. Such a civil penalty could be in excess of $255 million.

 The court is well satisfied that Exxon was fairly on notice that its officers could face imprisonment and the company could face in excess of $5 billion in criminal and civil penalties for recklessly spilling crude oil into Prince William Sound.

### New Developments

Since the Supreme Court's decisions in *BMW* and *State Farm*, both state and federal lower courts, when faced with the constitutionality of a punitive damages award, dutifully cite the three *BMW* guideposts and apply them, with varying results. In general, a review of post-*BMW* and post-*State Farm* cases offers little guidance to the court in its evaluation of the punitive damages award in this case. However, because this court is bound by the precedent of the Ninth Circuit Court of Appeals, the court has found *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir.2003), the one published case in which the court of appeals has considered the constitutionality of a punitive damages award after *State Farm*, helpful to its analysis.

*Zhang* was an employment discrimination case in which one plaintiff was awarded $360,000 in compensatory damages and $2.6 million in punitive damages on his Section 1981 claim. *Id.* at 1027. The court of appeals applied the *BMW* guideposts as clarified by *State Farm* to determine whether the punitive damages award was grossly excessive.

As for reprehensibility, the court of appeals found a "substantial gulf" between the reprehensibility of the defendants' intentional racial and ethnic discrimination and the conduct at issue in *BMW, Cooper*

*Industries,* and *State Farm. Zhang* at 1043. Similarly here, this court finds a vast gulf between the reprehensibility of Exxon's conduct in willfully allowing a relapsed alcoholic to continue to command a supertanker filled with toxic cargo and the conduct at issue in *BMW, Cooper Industries,* and *State Farm.*

As for the ratio guidepost, the court of appeals found a 7–to–1 ratio constitutionally acceptable, in large part because it was a single-digit ratio. The court of appeals observed that it was "aware of no Supreme Court or Ninth Circuit case disapproving of a single-digit ratio between punitive and compensatory damages, and we decline to extend the law in this case." *Zhang,* 339 F.3d at 1044. Here, this court finds a single-digit ratio constitutionally acceptable—not grossly excessive.

 Lastly, as to the comparable sanctions guidepost, the court of appeals noted that there was no comparable civil penalty but that Congress has imposed a $300,000 cap on punitive damages for Title VII discrimination claims. *Id.* at 1045. Although recognizing that $300,000 is less than the $2.6 million in punitive damages imposed, the court of appeals noted that it was not as great a discrepancy as there was in *BMW* and *State Farm. Id.* The court of appeals also stated that simply because one *BMW* factor raises constitutional concerns does not mean that the punitive damages award is constitutionally excessive. Here too, if we were to only look at comparable civil penalties, there could be constitutional concern. *Id.* But here, as in *Zhang,* the defendant (Exxon) engaged in highly reprehensible conduct. The latter is " '[t]he most important indicium of the reasonableness of a punitive damages award.' " *State Farm,* 123 S.Ct. at 1521 (quoting *BMW,* 517 U.S. at 575, 116 S.Ct. 1589).

*Conclusion*

 The Supreme Court instructed that punitive damages awards must be subjected to an "exacting" review to "ensure[ ] that an award of punitive damages is based upon an " 'application of law, rather than a decisionmaker's caprice.' " " *State Farm,* 123 S.Ct. at 1520–21 (quoting *Cooper Industries,* 532 U.S. at 436, 121 S.Ct. 1678) (quoting *BMW,* 517 U.S. at 587, 116 S.Ct. 1589 (Breyer, J., concurring)). This court has engaged in an exacting review of the $5 billion punitive damages award not once or twice, but three times, with a more penetrating inquiry each time. This court again concludes that a $5 billion award was justified by the facts of the case and is not grossly excessive so as to deprive Exxon of fair notice— its right to due process. This conclusion is based on the court's findings that:

(1) Exxon's conduct was highly reprehensible;

(2) the ratio of punitive damages to actual harm inflicted on the plaintiffs is a permissible one, 9.74–to–1; and

(3) the comparable criminal and civil penalties could have exceeded $5 billion.

 However, the court of appeals did not just remand this case for application of *BMW, Cooper Industries,* and *State Farm.* It instructed this court to reduce the punitive damages award, and the court must do that. Determining the amount of an award that will be constitutionally acceptable " 'is not an enviable task.' " *Leatherman,* 285 F.3d at 1152 (quoting *Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc.,* 181 F.3d 446, 468 (3d

Cir.1999)). As the Third Circuit Court of Appeals explained:

> We have searched vainly in the case law for a formula that would regularize this role, but have not found one. . . . [T]he Supreme Court has instructed as to the analysis but has provided nothing concrete as to the amount.

*Inter Medical Supplies,* 181 F.3d at 468. This observation remains as true today after *State Farm* as it was before *State Farm.*

Because the court's independent evaluation of the *BMW* guideposts as applied to the facts of this case have led it to the conclusion that the $5 billion award was not grossly excessive, the court does not perceive any principled means by which it can reduce that award. In their memorandum in opposition to the first renewed motion for reduction or remittitur of punitive damages, plaintiffs suggested that "a punitive damage[s] award of at least $4 billion satisfies the requirements of due process consistent with *BMW v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)." [115] In light of *State Farm,* which tells us that single-digit multipliers pass constitutional muster for highly reprehensible conduct, which is what we have here, and in light of *Zhang,* in which the Ninth Circuit Court of Appeals approved a 7–to–1 ratio for conduct that was also highly reprehensible, the court reduces the punitive damages award to $4.5 billion as the means of resolving the conflict between its conclusion and the directions of the court of appeals.

Exxon's motion for reduction or remittitur of the punitive damages award is granted. The sum of $500 million of the $5 billion jury award is remitted, and therefore the punitive damages award in this case is reduced to $4.5 billion. [116] The

**115.** Plaintiffs' Opposition at 80, Clerk's Docket No. 7501.

**116.** If Exxon accepts this result by paying the punitive damages award plus accrued interest, this case should of course end at that

point. However, if Exxon chooses to take a further appeal for the purpose of seeking a more generous reduction of the jury's punitive damages award, then the court again urges the plaintiffs to cross-appeal. If left to

clerk of court shall enter an amended partial judgment accordingly.[117]

All plaintiffs' lead counsel's motion for a Rule 54(b) determination [118] as to the punitive damages judgment is reinstated as is Exxon's opposition to the motion.[119] The court again concludes that there is no just reason to delay entry of a final judgment in this case. The court's judgment as to the $4.5 billion punitive damages award is deemed final for purposes of Rule 54(b), Federal Rules of Civil Procedure. In the alternative, the court concludes that an interlocutory appeal under 28 U.S.C. § 1292(b) is appropriate.

All plaintiffs' lead counsel's motion for a Rule 54(b) finality determination or, in the alternative, an interlocutory appeal, is granted.

apply *BMW* and *State Farm* without the requirement that it effect some reduction of the $5 billion punitive damages award, this court would have, as set out above, denied Exxon any relief whatever on its third motion for reduction or remittitur of punitive damages.

117. Interest on the reduced award of punitive damages shall accrue from September 24, 1996, in accordance with 28 U.S.C. § 1961.

118. Clerk's Docket No. 7569.

119. Clerk's Docket No. 7577.